1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
2            WESTERN DIVISION AT CINCINNATI

3    ----------------------------------- :

4    ANTERNITIA O'NEAL,                  :
     ADMINISTRATOR
5                 Plaintiff             :

6        vs.                             Case No. 1:12-CV00971

7                                        :

8    ORLANDO SMITH, et al.              :   Judge: SPIEGEL

9                 Defendant(s)          :

10   ---------------------------------- :

11

12

13        DEPOSITION OF: NATHAN ASBURY

14        TAKEN:        By the Plaintiff

15        DATE:         February 13, 2014

16        TIME:         Commencing at 11:30 a.m.

17        PLACE:        Offices of:
                        Hardin, Lazarus & Lewis, LLC
18                      915 Cincinnati Club Building
                        30 Garfield Place
19                      Cincinnati, OH 45202

20        BEFORE:       JENNIFER OLIVIER
                        Certified Court Reporter
21                      Notary Public - State of Ohio

22

23

24

25

                    FREELANCE COURT REPORTER
                 *Jennifer Olivier (513) 503-0372*

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:

 3
                    DIANE HUFF, ESQ.
 4                       of
                    Eric Deters & Partners P.S.C.
 5                  5247 Madison Pike
                    Independence, KY  41051
 6
 7        On behalf of Defendants:

 8                  DONALD HARDIN, ESQ.
                         of
 9                  Hardin, Lazarus & Lewis, LLC
                    915 Cincinnati Club Building
10                  30 Garfield Place
                    Cincinnati, OH  45202
11   AND

12                  PETER STACKPOLE, ESQ.
                    Assistant City Solicitor
13                  City of Cincinnati
                    801 Plum Street, Room 214
14                  Cincinnati, OH  45202

15                       - - -

16             S T I P U L A T I O N S

17        It is stipulated by and between counsel for the

18   respective parties that the deposition of NATHAN ASBURY, a

19   witness herein, may be taken at this time by Counsel for the

20   Plaintiff as upon cross-examination pursuant to the Ohio

21   Rules of Civil Procedure; that the deposition may be taken

22   in stenotype by the notary public-court reporter and

23   transcribed by her out of the presence of the witness; that

24   examination and signature of the transcribed deposition by

25   the witness is expressly NOT waived.
```

1                          I N D E X

2   NATHAN ASBURY                                    PAGE

3
              CROSS-EXAMINATION BY MS. HUFF          4
4
              EXAMINATION BY MR. HARDIN              -
5
                         EXHIBITS
6
     Exhibit Number              Marked              Refer
7

8                     NO EXHIBITS OFFERED

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2          11:38 AM
 3                          {Witness}
 4    being first duly sworn was examined and testified as if on
 5    cross-examination as follows:
 6                          CROSS-EXAMINATION
 7    BY MS. HUFF:
 8          Q.      Good morning, Officer Asbury.  My name is
 9    Diane Huff.  I'm an attorney for the Plaintiffs.  I
10    introduced myself before we went on the record.  Would you
11    state your name for the record.
12          A.      Nathan Asbury.
13          Q.      And Nathan, have you ever done a deposition
14    before?
15          A.      I have.
16          Q.      Okay.  So you're aware how they work.  But
17    just to go over a few things.  Make sure you say yes or no
18    so that record is clear as to your answer. Try not to speak
19    when I'm speaking and I'll do the courtesy of trying the
20    same and not speaking when you're speaking.
21          And if you don't understand a question I'm asking,
22    feel free to ask me to repeat it or clarify it, and I will
23    do that for you.
24          A.      Okay.
25          Q.      Otherwise, I'll assume that you understood
```

5

1    what I was asking and are answering correctly.

2         A.    Okay.

3         Q.    Can you just start by going through how you

4    became a police officer with Cincinnati Police Department.

5         A.    I took the test and passed it.

6         Q.    What year did you take the test to become a

7    police officer?

8         A.    2002.

9         Q.    Okay.  And was Cincinnati your first

10   department that you worked for?

11        A.    Yes.

12        Q.    What did you start out as?

13        A.    A police officer.

14        Q.    Just street patrol?

15        A.    Yes.

16        Q.    How did you get into undercover, plain

17   clothes work?

18        A.    In 2006 I interviewed for the position.

19   There was an opening.  And I was taken into District 4

20   Violent Crimes Squad.

21        Q.    In 2006?

22        A.    Yes.

23        Q.    Do you have to go to special training to go

24   into the -- is it called the plain clothes unit or

25   undercover unit?

1          A.         The full name is District 4 Violent Crimes

2     Task Force, commonly referred to as VCS, Violent Crime

3     Squad.

4          Q.         VCS, okay.  Did you have to go through any

5     special training to become a part of the VCS?

6          A.         No.

7          Q.         No.  And have you been in the District 4 VCS

8     since 2006?

9          A.         No.

10         Q.         What else have you done?

11         A.         Last year I was -- I applied for the District

12    4 Investigative Unit.  And was given that job in late 2006.

13    I was moved from District 4's Violent Crimes Squad to

14    Vortex.

15         Q.         What is Vortex?

16         A.         It was a unit that was created in 2006 to

17    police Over the Rhine, but go throughout the city.

18         Q.         Did you do the same things for Vortex that

19    you did for District 4?

20         A.         It was more proactive, not necessarily.  We

21    didn't answer radio runs.  It was more -- more, you know, to

22    stop the drug trade and the drug trafficking and stuff like

23    that, but it was in uniform.

24         Q.         Okay.  It was in uniform?

25         A.         Yes.

1      Q.     Okay.  How long were you on Vortex?

2      A.     Between four and six months.

3      Q.     Why did you switch from Vortex?  I'm assuming

4   you went back to District 4.

5      A.     I went back to District 4 Violent Crimes

6   Squad.  We were detailed to Vortex when it was first

7   created.  And then they opened it up to people who wanted to

8   apply to be in that position.

9      Q.     Okay.  And you didn't want to remain in the

10  position?

11     A.     No.  I had just been assigned to -- I had

12  only the been in District 4's VCS for a couple weeks.  So I

13  wanted to go back to do that.

14     Q.     Okay.  What did you like about District 4

15  work?

16     A.     It was my first assignment so kind of home.

17     Q.     Okay.  Felt comfortable there?

18     A.     Sure.

19     Q.     What title did you hold in 2011 when the

20  incident that brought us here today occurred?

21     A.     Just police officer in District 4's VCS.

22     Q.     Okay.  Are you now a detective in the

23  Investigative Unit?

24     A.     Technically, yes.

25     Q.     So that changed last year in 2013?

```
 1          A.      Yes.

 2          Q.      Okay.  Do you recall the night that this

 3    incident occurred?

 4          A.      I do.

 5          Q.      What were you doing that evening?  How did it

 6    start?

 7          A.      We were purchasing drugs.

 8          Q.      So you set up a protected drug deal or

 9    controlled -- what is it called?

10          A.      Yeah, correct.

11          Q.      And who did you set that up with?

12          A.      Who were we trying to buy drugs from?

13          Q.      Yes.

14          A.      Bobbie Matthews, Robert Matthews.

15          Q.      And you said we.  Who is we?

16          A.      The other members of District 4's Violent

17    Crimes Squad.

18          Q.      Can you give me their names?

19          A.      It was from the top, Sergeant Beechler,

20    myself, Steve Paponus, Tyler Hamlet, Shermel Davis and Ryan

21    Olthaus.

22          Q.      And you were all there?

23          A.      We were all working that evening.

24          Q.      Were you all working on this particular

25    controlled drug sale?
```

```
 1          A.      Yes.

 2          Q.      What was your role in that?

 3          A.      We were -- I was with Ryan Olthaus and we

 4   were back away from the actual drug buy itself as support.

 5          Q.      And you were in uniform or not in uniform?

 6          A.      Not in uniform.

 7          Q.      And as support, what is your duty?

 8          A.      To provide backup for the primary officers if

 9   something should go wrong.

10          Q.      And did you have an informant that helped you

11   set up the drug deal?

12          A.      Yes.

13          Q.      Who was that?

14          MR. STACKPOLE:  Objection.

15          MR. HARDIN:  Objection.

16          MS. HUFF:  Okay.

17          Q.      (By Ms. Huff)  Have you -- had you worked

18   with this informant before?

19          A.      Yes.

20          Q.      Had you used this informant to secure a drug

21   drop with Mr. Matthews before?

22          A.      Yes.

23          Q.      Okay.  Were you personally on any previous

24   drug drops that involved Mr. Matthews?

25          A.      When you say drug drop, what do you mean?
```

1     Q.     A controlled set up drug purchase --

2     A.     Yes.

3     Q.     -- that the police set up?

4     A.     Yes.

5     Q.     How many times?

6     A.     I don't recall.

7     Q.     Was it more than five?

8     A.     I don't recall.

9     Q.     Okay.  Did you have any other encounters with

10    Mr. Matthews?

11    A.     Yes.

12    Q.     Can you explain that?

13    A.     We stopped Mr. Matthews outside of 3522

14    Reading Road and one other time outside of the 3501 Reading

15    Road.

16    Q.     What for?

17    A.     I don't recall.  I know once he was taken to

18    jail, but I don't recall what he was charged with.

19    Q.     Can I ask how you recall what the specific

20    address was and not what you picked him up for?  It seems

21    pretty specific.

22    A.     The address?

23    Q.     Yes.

24    A.     I don't know.

25    Q.     Okay.  You just recall the address, but you

```
 1    don't recall what you picked him up for?

 2         A.    Correct.

 3         Q.    Okay.  Did you review something to determine

 4    what those addresses were?

 5         A.    No.

 6         Q.    Okay.  So you were backup for other officers

 7    doing the controlled drug sale.  How did the drug sale go?

 8         A.    I don't know.  We were back away, like I

 9    couldn't see the drug sale.  I couldn't hear the wire.

10         Q.    So as backup you couldn't see what was going

11    on?

12         A.    Correct.

13         Q.    How were you providing adequate backup if you

14    could not see what was going on?

15         A.    Well, the people that could see what was

16    going on, if they asked for backup, I would have backed them

17    up.

18         Q.    So you were being kind of backup for the

19    backup?

20         A.    No.

21         Q.    So you were just standing by in a

22    nonobservant position.  In case something happened, you

23    would get radioed?

24         A.    Yes.

25         Q.    Or if you happen to hear something happen,
```

```
 1    you would then take action?

 2             A.      Yes.   If the situation needed to, yes.

 3             Q.      Okay.   And is that standard of what your role

 4    was in other control drug sales?

 5             A.      Sometimes.

 6             Q.      What else have you done?   What other roles

 7    have you played?

 8             A.      I've been the one controlling the informant.

 9             Q.      Okay.   In other times that you were the one

10    in this backup position, were you able to observe what was

11    happening?

12             A.      Can you repeat the question?

13             Q.      In other instances where you played the role

14    as a backup in plain clothes for a controlled drug sale,

15    were you able to observe what was happening?

16             A.      No.

17             Q.      So that's standard that you're not able to

18    see what is going on?

19             A.      Correct.

20             Q.      And can you tell me if anything went wrong at

21    the drug sale?

22             A.      Not that I'm aware of.

23             Q.      Okay.   So they completed the sale?

24             A.      Yes.

25             Q.      And then what happened?
```

1          A.        Then I received a radio transmission from the

2     ones -- from the officers that were controlling the CI.

3          Q.        Let me ask you this.  As officers who are

4     controlling a CI, does that mean to Mr. Matthews or someone

5     involved in the drug sale, that they are also a drug dealer

6     or purchaser?

7          A.        I'm sorry, I didn't -- the question confused

8     me.

9          Q.        I'm sorry.  As somebody who is -- you said I

10    believe, controlling the CI, does that mean that they are

11    active in the drug sale in that somebody who is observing

12    them and not aware he's a police officer, assumed that he

13    was part of the drug sale?

14         A.        No, the person who is controlling the CI is

15    the one that has searched the CI, that gave the CI -- the

16    officer that gave the CI instructions.  If they had a

17    camera, if -- they took care of the money, all the details

18    that would go into the CI purchasing the drugs.

19         Q.        Okay.  And where would they be located during

20    the drug sale?

21         A.        It just depends.

22         Q.        Where were they located during that drug

23    sale?

24         A.        I have no idea.

25         Q.        Okay.  So you don't know where they were, but

14

```
 1    you received a radio from them?
 2           A.    Yes.
 3           Q.    And what did they say?
 4           A.    That the CI had observed one the passengers
 5    in the vehicle with a substantial amount of heroin.
 6           Q.    So would the CI have told the controlling
 7    officer this information and --
 8           A.    I'm not -- I wasn't privilege to their
 9    conversations.
10           Q.    Have you ever been the controlling CI
11    officer?
12           A.    Yes.
13           Q.    How do you find out information from a CI
14    when you're in that role?
15           A.    Either through a wire or through a phone
16    call.
17           Q.    Okay.  So is it fair to assume that the CI
18    informed this controlling officer of the amount of heroin
19    and that there was heroin in their position?
20           A.    That seems reasonable.
21           Q.    Okay.  And then he called you and told you
22    that there was, that they were possessing a significant
23    amount of heroin?
24           A.    Yes.
25           Q.    And then what is your next role when that
```

15

1    happens?

2         A.     We decided to stop the vehicle.  So we called

3    for -- radioed for a car, a uniform car, to conduct the

4    stop.

5         Q.     Now, when you do these kind of drug sales, is

6    there typically a uniformed car that is involved in order to

7    make a stop if necessary?  What I mean by that, a uniformed

8    that is assigned to be near the drug stop in case the stop

9    needs to be made?

10        A.     No.

11        Q.     And as the backup for the drug sale, it's

12   your duty to make a stop if one is necessary?

13        A.     No.

14        Q.     So why did you decide that day to take it

15   upon yourself to make the stop?

16        A.     It was not taken upon myself to make the

17   stop.

18        Q.     Can you explain that further?

19        A.     We decided as the VCS that because of the

20   substantial amount of heroin that was in the car, that we

21   were going to make the stop of the car.

22        Q.     Okay.  And then it was made your duty to the

23   make the stop?

24        A.     To radio for the uniform car to make the

25   stop.

1    Q.    Okay.  And then what do you do once a uniform

2    police officer is called?

3    A.    We continue to watch the drug deal until the

4    uniform car is able to make the stop.

5    Q.    And is that standard?

6    A.    I believe so.

7    Q.    Okay.  So you were watching the drug dealer.

8    Do you know who was identified as the drug dealer?

9    A.    Bobbie Matthews.

10   Q.    Okay.  Do you know where Bobbie Matthews was

11   in relationship to the positions seated in the vehicle?

12   A.    In the back seat.

13   Q.    Driver's side or passenger side?

14   A.    Passenger side.  I'm sorry, the driver's

15   side.

16   Q.    The driver's side.  So you were focused on

17   him and not the other passengers in the vehicle?

18   A.    That's not true.

19   Q.    Okay.  You were focused on all the

20   passengers?

21   A.    Yes.

22   Q.    Was there any indication that the other

23   passengers involved had any drugs on them or other drug

24   paraphernalia?

25   A.    Bobbie Matthews was the one that sold the

1    drugs to the informant.  And then the informant stated that

2    one of the other passengers had the drugs.

3          Q.      Did you know which passenger that was?

4          A.      I did not.

5          Q.      Did you know who either of the other

6    passengers were at that time?

7          A.      No.

8          Q.      And so you followed this vehicle after it

9    left wherever the drug sale was?

10         A.      We picked it up on -- we got in behind it on

11   West Mitchell.

12         Q.      Did you ever lose sight of the vehicle?

13         A.      Yes.

14         Q.      Was there ever a time where no officer had

15   sight of the vehicle?

16         A.      I don't know.  There was times I didn't have

17   sight of the vehicle.

18         Q.      Okay.  And was Officer Olthaus in the vehicle

19   with you?

20         A.      Yes.

21         Q.      In your vehicle.  And you picked him up on

22   what road?

23         A.      West Mitchell.

24         Q.      And you followed him to where this incident

25   occurred?

1        A.      They stopped at a gas station on West

2  Mitchell.

3        Q.      What did they do at the gas station that you

4  observed?

5        A.      Sold more drugs.

6        Q.      Okay.  Were you a part of planning that drug

7  stop or was the police involved with planning that second

8  drug stop?

9        A.      No, not to my knowledge.

10        Q.      Did you know any of the parties involved in

11  the drug stop?

12        A.      Huh-uh.  No, I do not.

13        Q.      Could that have been an opportunity to

14  intervene when you noticed the second drug stop?

15        A.      No.

16        Q.      And why is that?

17        A.      There were no uniformed cars there at that

18  point.

19        Q.      Okay.  Can only a uniformed officer make a --

20  intervene with a drug stop?

21        A.      No.

22        Q.      So why didn't you intervene?

23        A.      Just for the sake of safety.

24        Q.      Okay.  And why were you concerned about

25  safety?

1          A.      Well, we are in plain clothes.  It's just a

2     good idea to have a uniformed officer in a uniform car there

3     so nobody gets the wrong picture of what is going on.

4          Q.      Okay.  Were you aware at that time that

5     anyone involved with that drug stop had any type of weapon?

6          A.      That had not been related to me.

7          Q.      So from my understanding you chose not to

8     make an arrest or intervene at that time for safety reasons

9     because you wanted a uniformed officer there?

10         A.      Correct.

11         Q.      Okay.  And then after they did the second

12    drug stop, what happened?

13         A.      They pulled out on -- back onto West

14    Mitchell, went eastbound to Vine Street, when they turned

15    southbound on Vine Street.  We pulled out behind them.  They

16    continued driving until Officer Smith got behind them on

17    Burton Avenue.

18         Q.      Okay.  Do you frequently tail suspects or

19    suspect vehicles?

20         A.      Do I frequently do it?

21         Q.      Yes.

22         A.      What's frequent?

23         Q.      Is it something you've done before prior to

24    this incident?

25         A.      Yes.

20

1          Q.       Have you ever become aware of a time that a

2    person driving a suspect vehicle -- I'm sorry.  Let me

3    rephrase that.  Has there ever been a time where you felt

4    that the person driving the suspect vehicle, was aware that

5    they were being tailed?

6          A.       Yes.

7          Q.       In this instance did you believe that the

8    driver of the vehicle knew that he was being tailed?

9          A.       Yes.

10         Q.       Okay.  What do you do in a situation where

11   you think that they are -- they know that they're being

12   tailed?

13         A.       It just depends.

14         Q.       Okay.  Is it standard to keep tailing them?

15         A.       Sure.

16         Q.       Can you speak up just so we can get it on the

17   record?

18         A.       Sure.

19         Q.       When would you stop tailing them?

20         A.       It just depends on the circumstances.

21         Q.       Can you give me an example of why you would

22   stop tailing them?

23         A.       If at that point there was a crime that had

24   been committed, which would have been the trafficking in

25   drugs, we were going to arrest Bobbie Matthews.  I wasn't

1   going to stop tailing him until the uniformed car pulled him

2   over.  It didn't matter if they knew we were tailing them or

3   not at that point.  They were going to be arrested.

4         Q.      Okay.  So you were just trying to secure

5   their location to make the arrest?

6         A.      Yes.

7         Q.      And you pulled onto Burton Avenue and Officer

8   Smith was the officer that responded to the call you made

9   out for a uniformed police car or officer?

10         A.      Yes.

11         Q.      And when you made the call out for a uniform

12   officer, what did you say?

13         A.      I don't recall exactly what I said.

14         Q.      Okay.  Do you recall who responded to you?

15         A.      Initially?

16         Q.      Yes.

17         A.      It was Officer Jocks.

18         Q.      Do you know what Officer Jocks said?

19         A.      I don't recall exactly what she said.

20         Q.      And then I assume there was a follow-up

21   response to your call.  You said initially Officer Jocks

22   called?

23         A.      Officer Jocks said that she was coming toward

24   our location and then after she never showed up and Officer

25   Smith answered and said that he was close by.

1     Q.     Okay.  Do you know why she never showed up?

2     A.     I do not know.

3     Q.     Okay.  So Officer Smith said he was close by

4   and he appeared on Burton Avenue.  Was it right after you

5   pulled onto Burton Avenue?

6     A.     Yes.

7     Q.     Okay.  And the suspect vehicle was in front

8   of you?

9     A.     It was.

10     Q.     And where did Officer Smith drive to?

11     A.     Around my vehicle behind the black Honda.

12     Q.     The black Honda was the suspect vehicle?

13     A.     Correct.

14     Q.     So Officer Smith's vehicle was in between

15   your vehicle and the suspect vehicle?

16     A.     Yes.

17     Q.     How wide is Burton Avenue in car widths?

18     A.     I don't know.

19     Q.     If there is two cars parked on each curb, can

20   both lanes of the traffic pass at the same time?

21     A.     Yes.

22     Q.     So it's about four car lengths or a little

23   bigger?

24     A.     About four.

25     Q.     Were there vehicles on either side of the

1    suspect vehicle, if can you recall, parked?

2          A.     I know there was on the south side, but I'm

3    not sure about on the north side.

4          Q.     Okay.  And the south side would be the

5    driver's side?

6          A.     The south side would be if we were driving

7    from Reading Road toward the dead end.  That's the right

8    side of the passenger side.

9          Q.     Okay, the passenger side.  And were there any

10   parked vehicles next to Officer Smith's car that you recall?

11         A.     I don't recall.

12         Q.     And were there any parked vehicles next to

13   your car?

14         A.     I don't recall.  I mean, at what point?

15         Q.     When you first got there and Officer Smith

16   was parked in between the two, your vehicle and the suspect

17   vehicle?

18         A.     Officer Smith?  He was not parked.

19         Q.     He was not parked?

20         A.     No.

21         Q.     But at that point were there any parked cars

22   on the side of your vehicle?

23         A.     I don't recall.

24         Q.     Did you stop your vehicle and put it in park?

25         A.     At Reading and Burton?.

1   Q.  Yes.

2   A.  No.

3   Q.  Okay.  So you were still driving.  The

4 suspect vehicle is in front of you.  Officer Smith comes up

5 and pulls in between you and you are all still moving

6 forward?

7   A.  Yes.

8   Q.  Okay.  So what happens?

9   A.  Officer Smith turned his overhead lights on

10 and siren.  The suspect car slowed down and started to pull

11 to the curb.

12   Q.  To which side of the curb, the right or left?

13   A.  To the south side.

14   Q.  Was it then past the vehicle that was parked

15 there?

16   A.  I don't recall how many vehicles were parked

17 there.  There was room for him to pull over.

18   Q.  Okay.

19   A.  Then he hit the gas, pulled back out onto the

20 main lane of travel, drove a little bit further and then

21 started to pull to the curb again and then didn't; pulled

22 back into the main lane of travel and started to keep going

23 eastbound on Burton Avenue.

24   Q.  Okay.  And Officer Smith's lights and siren

25 were on during that time?

1    A.    Yes.

2    Q.    Do you know if he had the capability to speak

3  over a megaphone to their car?

4    A.    I don't know.

5    Q.    Okay.  Did you hear him speak over a

6  megaphone to the suspect car to pull over or stop or

7  anything like that?

8    A.    No.

9    Q.    Okay.  So they continued to accelerate

10  forward.  Were you still accelerating forward?

11    A.    I was following behind Officer Smith.

12    Q.    Okay.  And what happened?

13    A.    At one point the suspect vehicle tried to do

14  a U-turn, looked like they tried to do a U-turn.

15    Q.    So they turned to their left?

16    A.    Yes.

17    Q.    Okay.

18    A.    And then back into the main lane of travel

19  going eastbound.

20    Q.    So they were going forward, turned to their

21  left and then turned back to their right to continue going

22  the same direction they were going before they turned?

23    A.    Correct, correct.

24    Q.    Okay.  And then what happened?

25    A.    Then we got close to the dead end I witnessed

1    the front seat passenger jump from the vehicle.

2         Q.    Okay.  Let me ask you this.  Were you still

3    moving forward at this time?

4         A.    Yes.

5         Q.    Okay.  So you saw the front seat passenger

6    jump from the suspect vehicle?

7         A.    Yes.

8         Q.    Was the suspect vehicle still moving forward?

9         A.    I believe so.

10        Q.    What did you do when you saw the passenger

11   jump from the suspect vehicle?

12        A.    I stopped my car.

13        Q.    Did you put it in park?

14        A.    Yes.

15        Q.    How far away were you from Officer Smith's

16   vehicle when you stopped your car and put it in park?

17        A.    I have no idea.

18        Q.    Do you have any idea how far you were away

19   from the suspect vehicle?

20        A.    Not exactly.

21        Q.    Were you in the middle of the road when you

22   stopped?

23        A.    No.

24        Q.    Which side of the road were you towards?

25        A.    The right side.

1          Q.      Was there any parked vehicles on either side

2    of you that you can recall?

3          A.      I don't know exactly where the parked

4    vehicles were.  There were cars on both sides of the street,

5    but I don't know if they were right next to us or -- I don't

6    know exactly where they were.

7          Q.      Okay.  That's fine.  So you put your car in

8    park and were you still watching the vehicle -- or I'm

9    sorry, the passenger that had jumped out of the suspect

10   vehicle?

11         A.      Yes.

12         Q.      What did you observe him doing?

13         A.      He was running southbound.

14         Q.      So towards you or away from you?

15         A.      I guess perpendicular to me.  If I was facing

16   east, he was running south from my left to my right.

17         Q.      So you jumped out of the right side of the

18   vehicle which is the south side and ran straight?

19         A.      Yeah.

20         Q.      Okay.  Did you observe anything in his hands?

21         A.      My attention was immediately taken away from

22   him, so no.

23         Q.      But you said you were watching him for some

24   time and observed him?

25         A.      I did not say that.

28

1        Q.     Okay.  Well, let's start over then.  You were

2   behind Officer Smith and the suspect vehicle and you were

3   moving forward as were the other vehicles.  You saw them

4   turn left and turn back right and continue going forward,

5   correct?

6        A.     Yes.

7        Q.     And then what happened?

8        A.     Once we got toward the dead end, the

9   front-seat passenger opened his door, exited his vehicle and

10   started to run southbound.

11        Q.     Okay.  So you saw him running?

12        A.     Yes.

13        Q.     Did you observe anything while you saw him

14   running in his hands?

15        A.     I could not see, no.

16        Q.     Okay.

17        A.     I could not see his hands.

18        Q.     What time was it?

19        A.     It was nighttime.

20        Q.     Okay.  Was it after 10:00?

21        A.     I don't remember exactly what time it was it

22   was dark.

23        Q.     It was dark.  Were there street lights?

24        A.     I don't think so.

25        Q.     So no street lights.  Were your headlights

1    on?

2           A.       Yes.

3           Q.       Were Officer Smith's headlights on?

4           A.       I was behind him.

5           Q.       Okay.  Were your headlights lighting up

6    Officer Smith's rear of his vehicle?

7           A.       When we got to the dead end of Burton?

8           Q.       When you put your car in park?

9           A.       I don't know.

10          Q.       Okay.  So you saw the passenger jump out of

11   the car and run southbound, but you could not observe if he

12   had anything in his hands, correct?

13          A.       Correct.

14          Q.       Okay.  And you said your attention was taken

15   away from the running passenger?

16          A.       Yes.

17          Q.       What distracted your attention?

18          A.       The black Honda had put his -- his reverse

19   lights came on and he was backing up towards me.

20          Q.       Backing up quickly?

21          A.       Yes.

22          Q.       Okay.  So he had like floored it and was

23   backing up right towards you?

24          A.       Yes.

25          Q.       Were you still in the vehicle?

1      A.      I was outside the vehicle.

2      Q.      When did you get outside the vehicle?

3      A.      As soon as I -- when the front seat passenger

4  exited the suspect vehicle, I stopped my vehicle, put it in

5  park and stepped out.

6      Q.      Okay.  So you jumped out right away?

7      A.      Yes.

8      Q.      What did you do when the suspect vehicle was

9  backing up towards you?

10     A.      It appeared that he was going to hit me, so I

11  --

12     Q.      Hit you or hit the vehicle?

13     A.      Hit me.  And I was standing in the wedge of

14  the door.  I had opened the door, stepped out and looked at

15  guy running and was immediately drawn to the car backing up.

16     Q.      Let me ask you this.  Had you drawn a weapon

17  at that time?

18     A.      I don't believe so, no.

19     Q.      Okay.  So your hands are free and you're

20  standing there in the wedge of the door of your vehicle?

21     A.      Yes.

22     Q.      And the car is backing up toward you and you

23  believed it was going to hit you?

24     A.      Yes.

25     Q.      So what did you do?

```
 1          A.     I backed up to the rear of my car.

 2          Q.     Okay.  And then what happened?

 3          A.     Then I realized that he was going to hit the

 4    front of my car with his car.

 5          Q.     So did you do anything?

 6          A.      I dove.

 7          Q.     To get away from the rear so the car wouldn't

 8    then hit you?

 9          A.     Correct.

10          Q.     Which way did you dive?

11          A.     South.

12          Q.     Okay.  So towards the right?

13          A.     Yeah.  If you're facing the dead end, I dove

14    to the right.

15          Q.     Toward the passenger side of your vehicle?

16          A.     Yeah, but away from the car.

17          Q.     Correct.  Did your car move at all?

18          A.     Yes, it did.

19          Q.     Did you get hit at all?

20          A.     I did not.

21          Q.     Okay.  Did you dive behind any vehicle that

22    was parked on the side?

23          A.     I don't remember.

24          Q.     Okay.  So you don't remember if you dove

25    behind a vehicle and -- or were you still -- let me ask you
```

1    this.  Did you land on the street when you dove to the side?

2         A.      The street or the sidewalk.  I think it was

3    further.  I was on the sidewalk.

4         Q.      Okay.  And what happened after you had jumped

5    out of the way?

6         A.      As soon as I cleared the back of the car, his

7    car hit my car and pushed my car back.

8         Q.      Did you observe this or did you just hear it?

9         A.      I heard it.

10        Q.      Okay.  Were you facing down?

11        A.      I was face down.

12        Q.      Okay.  Head towards the south?

13        A.      Yes.

14        Q.      Okay.  Go on.

15        A.      There is a crash.  Then I hear a gunshot and

16   then more gunshots.

17        Q.      You heard a gun shot right after the crash?

18        A.      I don't know.  I would say within second.

19        Q.      Okay.  Did you ever hear a car door open?

20        A.      I don't know what a car door sounds like when

21   it opens.

22        Q.      You don't know what a car door sounds like

23   when it opens?

24        A.      Typically I don't think that I could hear a

25   car door open after the crash and me laying down on the

1    sidewalk and sirens going.

2         Q.    Okay.  Did you observe at any point between

3    you putting your car in park and jumping to the side of

4    sidewalk, Officer Smith getting out of his vehicle?

5         A.    I'm sorry.  Could you repeat the question.

6         Q.    Did you observe Officer Smith getting out of

7    his vehicle at any time between putting your car in park and

8    jumping to the side to get out of the way of getting hit?

9         A.    No.

10        Q.    Did he get out of his vehicle before that

11   time?

12        A.    I don't know.

13        Q.    When you put your car in park, was Officer

14   Smith still in his vehicle?

15        A.    I have no idea.

16        Q.    Wasn't he right in front of you?

17        A.    At some point and I don't know how it

18   happened, the black Honda was the only car in between -- was

19   directly in front of me.  I don't know how it happened.  I

20   wasn't watching what Officer Smith was doing.  I was not

21   watching what his car was doing.  I watched the guy run and

22   next thing I know there's a car backing up toward me.

23        Q.    Okay.  When you say the suspect was between

24   your vehicle and Officer Smith's vehicle, was this before

25   the passenger jumped out and ran.  I know it's been a while

1    ago, so it's hard to remember everything.

2         A.    Could you repeat the question?

3         Q.    Okay.  You had said at some point, and your

4    not sure how it happen, but the suspect vehicle was between

5    your vehicle and Officer Smith's.

6         A.    I don't think it was between.  There was

7    nothing in between us.

8         Q.    Who's us?

9         A.    The black Honda and my car.

10        Q.    Okay.  So let's backtrack here.  You pulled

11   up on Burton.  Officer Smith you said came in between you

12   and the suspect vehicle?

13        A.    Yes.

14        Q.    Okay.  And then they tried to turn and make a

15   U-turn.  And then you had just mentioned that at some point

16   the black Honda was between your vehicle and Officer Smith's

17   vehicle and you said you're not sure how that happened.  I'm

18   just trying to figure out at what point in time was the

19   suspect vehicle between yours and Officer Smith's vehicle.

20        A.    Again, I don't know if it was between our

21   vehicles.  I don't know what happened to the police car.

22   All I know is that the front seat passenger exited the

23   vehicle.  When he did, I started to get out to pursue him

24   and the next thing I know, there is reverse lights and the

25   black Honda is speeding toward me.

1      Q.      Okay.  Do you know that before -- do you know

2    if before the passenger jumped out, was Officer Smith's car

3    still in between your car and the black Honda?

4      A.      Before the guy ran.

5      Q.      Okay.

6      A.      Right?

7      Q.      Yes.

8      A.      Is that what you're asking?

9      Q.      Yes.

10     A.      Yes.

11     Q.      Okay.  So right before the guy runs, your car

12   is right behind Officer Smith's car, which is behind the

13   suspect vehicle?

14     A.      Yes.

15     Q.      Okay.  And then you see a guy jump out and

16   run southbound?

17     A.      Yes.

18     Q.      And then you see the suspect vehicle back

19   into your vehicle?

20     A.      Yes.

21     Q.      So did it turn and back around Officer

22   Smith's car?  Would it have had to do that?

23     A.      I don't know.

24     Q.      Would it have gone around it?

25     A.      I don't know.

1    Q.    But Officer Smith's car was right in front of

2  your car?

3    A.    I don't know where Officer Smith's car was at

4  that time.

5    Q.    Okay.  So you're kind of conflicting yourself

6  here because you're saying --

7         MR. HARDIN:  There's going to be an objection

8         to that comment.

9         MS. HUFF:  That's fine.  We'll keep going.

10   Q.    (By Ms. Huff)  I'm going to ask you again

11 because I'm trying to figure out how this happened.

12   A.    Go ahead.

13   Q.    After you turn on Burton -- after, where did

14 Officer Smith pull?

15   A.    He pulled in front of my car behind the black

16 Honda.

17   Q.    Okay.  So he was in between your vehicle and

18 the suspect vehicle?

19   A.    Correct.

20   Q.    Was he directly in between your vehicle and

21 the suspect or was he to one side or the other?

22   A.    No.  We were all in the eastbound lane of

23 travel.

24   Q.    Okay.  So he was directly in front of you?

25   A.    Yes.

37

 1          Q.      Then you saw the passenger jump out of the

 2   passenger side of suspect vehicle?

 3          A.      Down toward the dead end.

 4          Q.      As you're moving down towards the dead end,

 5   are all three vehicles still in the same sequential

 6   positions?

 7          A.      Yes.

 8          Q.      Same -- still in the same lane of travel?

 9          A.      Yes.

10          Q.      Okay.  So you're down towards the end of the

11   lane and a passenger jumps out and runs southbound?

12          A.      Correct.

13          Q.      You're watching him run out, but then you see

14   the suspect vehicle back into yours?

15          A.      Yes.

16          Q.      And it somehow went right through Officer

17   Smith's vehicle?

18                  MR. HARDIN:  Objection to the form of

19                  question.  You may answer.

20          A.      That would obviously be impossible for the

21   vehicle to go through Officer Smith's car.

22          Q.      (By Ms. Huff)  Okay.  But when you saw the

23   lights turn on, did you see it veer to the right or to the

24   left of Officer Smith's vehicle?

25          A.      When he jumped out of the car, my attention

38

1    was drawn toward him.  I parked my car, put the car in park,

2    opened the door and I looked over across to about 1:00.  I

3    started to step out into the street to chase him.  And as

4    I'm watching him out of my peripheral vision, I see the car

5    backing up.

6           Q.    Did you see the brake lights come on?

7           A.    I saw the reverse lights come on.

8           Q.    You saw them when they came on?

9           A.    The reverse lights.

10          Q.    I'm sorry, yes, the reverse lights.

11          A.    That's what drew my attention back to that.

12          Q.    So you were watching the black vehicle, the

13    suspect vehicle from the point that the reverse lights came

14    on to the point where you jumped out of the way?

15          A.    Yes.

16          Q.    Did you see it turn it's wheels to go around

17    Officer Smith's car?

18          A.    No.  I didn't see Officer Smith's car.

19          Q.    You didn't see Officer Smith's car.  Okay?

20    So let me ask you this.  You said you got out of the vehicle

21    to pursue the passenger into the street.  Were you -- is

22    that where you were standing in the wedge of your vehicle?

23          A.    Yes.

24          Q.    The door?

25          A.    Yes.

1           Q.      Okay.  So I just want to reiterate this.  You

2    do not know how the suspect vehicle got around Officer

3    Smith's vehicle?

4           A.      I do not.

5           Q.      Okay.  You heard a crash.  You heard gun

6    shots.  Then what happened?

7           A.      I put out on the radio shots fired, stood up.

8    The black Honda was going forward.

9           Q.      Let's backup a little bit.  You're still

10   laying on the ground when you radio that shots have been

11   fired?

12          A.      I was in the process of getting up, yes.

13          Q.      Had the shots stopped at that point?

14          A.      I don't know.

15          Q.      You don't know?

16          A.      I don't know.

17          Q.      Okay.  Did you just stand up and turn around?

18          A.      I -- sure, I stood up and turned around.

19          Q.      Did you seek cover at all?

20          A.      No, not at that point.

21          Q.      Okay.

22          A.      I was laying back behind, I guess, the front

23   of my car.

24          Q.      The front of your car, okay.  You said that

25   you got out of your car, moved to the back of it and then

1    jumped to the side, dove to the side?

2         A.    Yes.

3         Q.    Does that mean that the suspect car hit your

4    vehicle hard enough to the push it back where the front was

5    next to you?

6         A.    When I dove, I was even with the bumper.  And

7    when I got up, I was near the front of the car.  So the car

8    had moved, yes.

9         Q.    Okay.  So the crash happened right next to

10   you?

11        A.    Yeah.

12        Q.    Okay.  Which also means that shots were shot

13   right next to you?

14        A.    Close.

15        Q.    Correct?

16        A.    Yeah.

17        Q.    Okay.  About how far away had you dove from

18   your vehicle.  You said you were about on the sidewalk.  Can

19   you give me an estimate in feet?

20        A.    Five, six, seven to eight feet, I guess.

21        Q.    So five to eight feet you had jumped away

22   from your vehicle.  Would that be five to eight feet from

23   the passenger side of -- your passenger rear side of your

24   vehicle?

25        A.    That is how I estimated it, yeah.

```
 1          Q.      Okay.  And when you stood up, as you were
 2   radioing.  Did you draw your weapon?
 3          A.      Yes.
 4          Q.      So you had your weapon drawn at that point?
 5          A.      Yes.
 6          Q.      Did you have it aimed?
 7          A.      No.
 8          Q.      At anything or anyone?
 9          A.      No.
10          Q.      Where was it?
11          A.      In my right hand.
12          Q.      By your side?
13          A.      Yes.
14          Q.      Okay.  So you stood up and had drew it, but
15   you were holding it down still?
16          A.      Yes.
17          Q.      When you stood up, did you see Officer Smith?
18          A.      Yes.
19          Q.      Where was he standing?
20          A.      He was closer to the north side of the
21   street.
22          Q.      Okay.  Outside of his vehicle?
23          A.      Yes.
24          Q.      So at some point he jumped out of his vehicle
25   while you were out to the side?
```

```
1              A.       I don't know when got out.

2              Q.       Okay.  And did Officer Smith have his gun

3    drawn?

4              A.       He did.

5              Q.       And where was it aimed at?

6              A.       At the -- looked like the driver area of the

7    black Honda.

8              Q.       And in relation to the suspect vehicle, where

9    was Officer Smith?

10             A.       If the car was in -- if the suspect vehicle

11   was in the eastbound lanes, he was in front of it to the

12   left.

13             Q.       Okay.  So northwest -- or northeast?  I'm

14   sorry.

15             A.       Just north of it, yeah.

16             Q.       Okay.  Was he -- was he perpendicular to the

17   driver's side or was he farther east to the driver's side of

18   vehicle?

19             A.       I don't recall exactly.

20             Q.       Did you look at the vehicle to observe

21   anything that was going on with the suspect vehicle when you

22   stood up?

23             A.       From my vantage point I couldn't see.  As I

24   was standing up, the car was -- my car was between -- my car

25   was between me and the suspect vehicle.
```

1        Q.      Okay.  So you couldn't see the passengers in

2   the vehicle?

3        A.      No.

4        Q.      And so you didn't see whether or not they had

5   any weapons?

6        A.      I couldn't see.  I couldn't see the car.

7        Q.      And you said that the vehicle, the suspect

8   vehicle, then accelerated after you stood up?

9        A.      It started to go forward again.

10       Q.      Okay.  Directly forward?

11       A.      Forward and to the left.

12       Q.      Towards Officer Smith?

13       A.      Toward that direction.

14       Q.      Okay.  Did you aim your weapon at that time?

15       A.      No, I couldn't see the car.

16       Q.      You couldn't see the car?

17       A.      No, not from -- like I said, my car was

18   between me and the black Honda.

19       Q.      But you saw it accelerating forward.

20       A.      I do know it was moving forward.

21       Q.      Okay.

22       A.      But I couldn't see it that well to see the

23   passengers or any occupants at that point.

24       Q.      Okay.  At that point had you known who had

25   fired shots?

1              A.      No.

2              Q.      Did you assume that like it was Officer Smith

3       or it was a passenger?  What were you are thoughts?

4              A.      I don't know.  I didn't assume anything.  I

5       knew that somebody was shooting.

6              Q.      Okay.  Did you believe that the suspect

7       vehicle was moving towards Officer Smith?

8              A.      It was moving toward Officer Smith.

9              Q.      But you did not aim your weapon at them when

10      you saw the vehicle moving toward Officer Smith?

11             A.      No, I couldn't -- no, no.

12             Q.      Okay.  Did you think that vehicle was going

13      to hit Officer Smith?

14             A.      I didn't really think that, no.  I didn't

15      really think anything at that point.

16             Q.      Okay.  So you didn't think it was going to

17      hit Officer Smith so you didn't think it was necessary to

18      take action against the driver to protect Officer Smith?

19             A.      No.  I didn't say anything any of that.

20             Q.      I know you didn't say that.  I just wanted to

21      make sure you didn't have any of those thoughts.  What

22      happened after you saw car moving forward?

23             A.      It crashed into a parked car.

24             Q.      Where was the parked car?

25             A.      On the north side of the street.

1        Q.      Okay.  So it had went from the south side of

2  the street to the north side of the street and crashed into

3  another vehicle?

4        A.      Yes.

5        Q.      What was Officer Smith doing at that time?

6        A.      I don't know.

7        Q.      Had you heard any more gun shots?

8        A.      Any more?

9        Q.      From the time you stood up until the time the

10  suspect vehicle crashed into the vehicle on the northbound

11  side?

12        A.      No.

13        Q.      What did you do after you saw the suspect

14  vehicle crash into the parked car?

15        A.      I started moved toward the black Honda and

16  realized that Bobbie Matthews was laying in the street shot.

17        Q.      Did you ever see Bobbie Matthews get out of

18  the car?

19        A.      No.

20        Q.      Do you know what was -- what had happened to

21  the passenger that had jumped out and ran southbound at that

22  point?

23        A.      The last time I saw him he was running south.

24        Q.      You saw Bobbie Matthews laying on the ground.

25  What did you do?

1        A.      I ran up to him.  There was a t-shirt laying

2   in the street.  I picked the t-shirt up.  I saw that Bobbie

3   had been shot in his right wrist.  I tied the t-shirt around

4   his wrist to try to control the bleeding.

5        Q.      You still had your gun drawn at this point?

6        A.      I put my gun away.

7        Q.      You put your gun away when?

8        A.      When I got to Bobbie Matthews and realized

9   that he didn't have a firearm in his hand.

10       Q.      So you looked to see if he had a firearm in

11  his hand?

12       A.      Yes.

13       Q.      Did you pat him down?

14       A.      Yes.

15       Q.      And did you find anything?

16       A.      When I first patted him down, I didn't find

17  anything, no.

18       Q.      Okay.  The way you said that, makes me think

19  you later patted him down and found something?

20       A.      No, I didn't.

21       Q.      Okay.  So what did you do with the T-shirt?

22       A.      I tied it around the gunshot wound on his

23  right wrist.

24       Q.      Okay.  Did you see any other gunshot wounds?

25       A.      No.

```
 1          Q.      Where was he laying?

 2          A.      In the street.

 3          Q.      Was he next to your vehicle?

 4          A.      I don't remember exactly where he was laying

 5   in the street.

 6          Q.      Okay.  Was he to the north side or the south

 7   side of your vehicle?

 8          A.      The north.

 9          Q.      Okay.  Which would be the driver's side of

10   your vehicle, correct?

11          A.      Yes.

12          Q.      Was he within the length of your vehicle on

13   the street?  And my by that I mean, if we took the length of

14   your vehicle and drew lines to the north side of the street,

15   was he in that area?

16          A.      I don't remember exactly where, if he was to

17   the left or to the right or within the length of my vehicle.

18   I don't recall exactly where he was.

19          Q.      Okay.  But he was toward the north side?

20          A.      He was on the north, yes.

21          Q.      Was he closer to your vehicle or the suspect

22   vehicle?

23          A.      At that point closer to mine, I believe.

24          Q.      Okay.  And did you cuff Mr. Matthews?

25          A.      Yes.
```

```
 1              Q.      Did you put him in your car or in a cruiser?

 2              A.      No.

 3              Q.      You just left him there cuffed?

 4              A.      No.  Two other officers showed up.

 5              Q.      Okay.  Who were those officers?  Let me ask

 6      you this.  Were they uniformed officers?

 7              A.      Yes.

 8              Q.      So they had showed up as you were cuffing Mr.

 9      Matthews?

10              A.      Yes.

11              Q.      And they then took care of securing Mr.

12      Matthews?

13              A.      Yes, ma'am.

14              Q.      And then what did you do?

15              A.      I ran back toward the Honda.

16              Q.      The suspect vehicle?

17              A.      Yes.

18              Q.      Okay.  Why did you do that?

19              A.      Well, I know there were shots fired from that

20      area.  I still didn't know who was shot or I didn't know if

21      that's where Orlando was.  That's where Olthaus was at that

22      point.

23              Q.      Okay.  So you saw Officer Smith near the

24      suspect vehicle?

25              A.      Yes.
```

1    Q.    Where was he at in relation to the suspect

2  vehicle?

3    A.    At driver's side door.

4    Q.    He was at the driver's side door right next

5  to it?

6    A.    Yes.

7    Q.    And where had Officer Olthaus gone?

8    A.    He was toward the passenger side of the black

9  Honda.

10    Q.    Okay.  And what -- do you know what either of

11  them were doing?

12    A.    I could hear Officer Smith saying, you're

13  going to be okay.  Helps is coming.

14    Q.    Do you know who he was referencing those

15  comments towards?

16    A.    It appeared he was talking to the driver of

17  the vehicle.

18    Q.    Who we now know was Mr. O'Neal?

19    A.    Yes.

20    Q.    And Mr. Matthews was the passenger in the

21  back seat of the vehicle, correct?

22    A.    Yes.

23    Q.    And at that time Mr. O'Neal was the only

24  person in the vehicle?

25    A.    Yes.

50

1    Q.    And what was Officer Olthaus doing?

2    A.    He was standing at the passenger door.

3    Q.    Was he doing anything?

4    A.    I don't know.

5    Q.    Was he saying anything?

6    A.    Not that I heard.

7    Q.    And what did you do when you approached

8 vehicle?

9    A.    I ran to the passenger side door and looked

10 into the car.

11    Q.    Okay.  And had you drawn your gun as you were

12 approaching the vehicle?

13    A.    Yes.

14    Q.    So you had your gun drawn when you first got

15 up after diving to the south.  Then you put it away as you

16 were approaching Mr. Matthews and then you redrew it as you

17 were approaching the suspect vehicle?

18    A.    I put it away so that I could bandage Bobbie

19 Matthews' arm and put him in handcuffs.  And then I redrew

20 it as I was approaching the black Honda.

21    Q.    Okay.  Did you have it up and aimed?

22    A.    No.

23    Q.    Or down to your side?

24    A.    Down to my side.

25    Q.    Okay.  Did any of the other officers have

 1     their guns drawn?

 2            A.      I don't know.

 3            Q.      Okay.  And what did you observe when you

 4     walked up to the passenger door?

 5            A.      I walked up to the passenger door, looked in.

 6     Mr. O'Neal was laying over top of the center console with

 7     his upper body in the passenger seat.  There was a firearm

 8     laying on the seat next to his hand.  His feet still over in

 9     the floor board of the driver's side.

10            Q.      Had you ever observed Mr. O'Neal getting out

11     of the vehicle?

12            A.      I did not.

13            Q.      And what I mean by that, not at that time but

14     any time during the incident, did you observe him getting

15     out of the vehicle?

16            A.      No.

17            Q.      Did it appear to you that he was -- that he

18     had ever gotten out of the vehicle the way he was seated?

19     You mentioned his feet were still on the driver's side floor

20     board.

21            A.      I don't know how I could tell if he had been

22     out the vehicle or not.

23            Q.      Okay.  Was the driver's side door open when

24     you approached the suspect vehicle?

25            A.      Yes.

52

```
1          Q.      Okay.  Do you know who opened it?

2          A.      No.

3          Q.      Was the passenger side door open?

4          A.      I don't remember.

5          Q.      Okay.  So you observed the gun and what did

6    you do?

7          A.      I grabbed the gun.

8          Q.      Okay.  Did you grab it through the window?

9          A.      I don't remember.  I don't remember if I -- I

10   don't remember if I opened the door or if it was already

11   opened.

12         Q.      How was the gun positioned on the seat?

13         A.      It was laying on the seat close to the edge

14   of the -- I guess the floorboard area, but on the seat maybe

15   a quarter inch, half inch from Mr. O'Neal's hand.

16         Q.      Okay.  And I'm not very familiar with guns,

17   but the end that you shoot out of is called the muzzle, I

18   believe.

19         A.      Sure.

20         Q.      And which direction was that facing?

21         A.      Basically it would have been facing straight

22   like toward the front of the car, but slightly to the left.

23         Q.      Okay.  So was the handle facing toward Mr.

24   O'Neal's hand?

25         A.      Yes.
```

1     Q.     Okay.  What did you do after you observed the

2  gun?

3     A.     I grabbed the gun.

4     Q.     And what did you do with it?

5     A.     I put it on the roof of the car.

6     Q.     Did you check to see if there was a safety on

7  or anything like that?

8     A.     I did not manipulate it at all.

9     Q.     So you just picked it up and put it on the

10  top of the vehicle?

11     A.     Yes.

12     Q.     Do you know what happened to it after that?

13     A.     It stayed on top of the vehicle until I guess

14  it was picked up during the crime scene investigation.

15     Q.     Okay.  Did you observe any shells in the

16  vehicle -- in the suspect vehicle?

17     A.     I didn't look for any shells in the vehicle.

18     Q.     Okay.  Regardless of whether you looked for

19  any, did you see any?

20     A.     I didn't.

21     Q.     Okay.  And what did you do after you put the

22  gun on top of the vehicle?

23     A.     I ran around to the driver's side.

24     Q.     Okay.  And who was on the driver's side at

25  that time?  Was Mr. Smith still there?

54

```
 1          A.      Officer Smith.

 2          Q.      Officer Smith, he was still there?

 3          A.      Yes.

 4          Q.      And was anyone else there?

 5          A.      No.

 6          Q.      Okay.  So it was you and Officer Smith.  And

 7   what were you doing?

 8          A.      I looked in to see where Mr. O'Neal was

 9   wounded and if I could provide any first aid for him.

10          Q.      And where did you observe wounds to him?

11          A.      His left side.

12          Q.      And how many wounds did you see?

13          A.      I saw at least two.

14          Q.      Did you observe any of the wounds as being

15   fatal?

16          A.      It appeared to be.

17          Q.      Was Mr. O'Neal coherent?

18          A.      I don't know.

19          Q.      Did you still have your gun drawn at this

20   time?

21          A.      I don't think so.

22          Q.      Okay.  When did you put it away?

23          A.      I don't know.

24          Q.      Okay.  But some time between walking up to

25   the car and getting on the driver's side you think you put
```

1    it away?

2          A.      When I first approached the car I had my

3    firearm in my hand and while ran to the driver's side.

4    After taking the gun away from him, I put my firearm away

5    somewhere in there.

6          Q.      Okay.  What else happened after you observed

7    Mr. O'Neal to see if you could help resuscitate him or give

8    him any help?

9          A.      I know we were -- we were still on the radio

10   trying to coordinate the responding cars to let them know

11   that there was still a person that was -- that had ran

12   southbound.  Officer Smith was complaining about pain in his

13   arm.

14         Q.      Do you know what that was from?

15         A.      No.

16         Q.      Did you observe any wounds or injuries to

17   Officer Smith?

18         A.      No.

19         Q.      Did you hear Officer Smith say anything else?

20         A.      Just complaining about his arm hurting.

21         Q.      Okay.  Did he mention to you why his -- did

22   he explain to you why shots were fired?

23         A.      No.

24         Q.      Did you ask him?

25         A.      No.

1      Q.      You didn't ask him what happened?

2      A.      No.

3      Q.      Okay.  Did you help collect evidence from the

4  crime scene?

5      A.      No.

6      Q.      Okay.  What was Officer Olthaus doing while

7  you were standing on the driver's side of vehicle with

8  Officer Smith?

9      A.      He was on the radio also.

10     Q.      Do you know where he was standing?

11     A.      On the passenger side.

12     Q.      Okay.  So he stayed over there?

13     A.      I believe so.

14     Q.      Okay.  At what point did Officer Olthaus get

15  out of the vehicle that the two of you were in?

16     A.      As soon as the front seat passenger exited.

17     Q.      So you both got out at the same time?

18     A.      Roughly.

19     Q.      And do you know what he did?

20     A.      No.

21     Q.      Okay.  Was he by the vehicle when it got hit?

22     A.      I have no idea.

23     Q.      No, idea.  Okay.  Is there a duty at all to

24  pay attention to where other officers are to make sure that

25  they are not in an unsafe position?

```
 1          A.      Can you repeat the question?

 2          Q.      Is there a duty that you have or that

 3   officers have in general whether dressed or undressed to

 4   know --

 5              MR. HARDIN:   In uniform or in plain clothes.

 6          I don't think they go around undressed.

 7              MS. HUFF:  I'm sorry.

 8          Q.      (By Ms. Huff)  Whether in uniform or in plain

 9   clothes, to know where the other officers are to make sure

10   they are not in an unsafe position?

11          A.      That would be ideal.  However, things kind of

12   developed really quickly.

13          Q.      So you were just trying to keep yourself safe

14   and not get --

15          A.      Alive.

16          Q.      -- hit by the vehicle?

17          A.      Alive, yeah.

18          Q.      Okay.  Did you and Officer Olthaus discuss

19   anything in the vehicle as you were tailing the suspect

20   vehicle as you were on the scene of the incident?

21          A.      We were attempting to coordinate the traffic

22   stop while we were tailing the vehicle with a uniform

23   through dispatch.  And you asked if we talked on scene?

24          Q.      Did you guys discuss anything in the vehicle?

25          A.      Could you be more specific?
```

58

1      Q.      Yes.  Did you guys discuss anything about Mr.

2  Matthews while you were in the vehicle?  Because at this

3  point I believe you were aware that Mr. Matthews was in the

4  vehicle.

5      A.      Yes.  No.  The answer is, no.

6      Q.      Okay.  Did you discuss anything beyond

7  calling dispatch to secure a unformed police officer?

8      A.      I don't think so, no.

9      Q.      Okay.  When you arrived on Burton Avenue, did

10 you discuss a plan of action?

11     A.      When we arrived on Burton Avenue?  No.

12     Q.      Did you know that Burton Avenue was a

13 dead-end street?

14     A.      Yes.

15     Q.      Did you think there was something that you

16 would have to do knowing that it was a dead-end street?

17     A.      At that point, the driver of the car was kind

18 of dictating what we did or didn't do.

19     Q.      Okay.  So you and Officer Olthaus didn't

20 discuss a plan?  You just went with the flow?

21     A.      There wasn't time to discuss any plans.

22     Q.      Okay, that's fair.  Do you recall how many

23 gunshots you heard?

24     A.      No, I don't know.

25     Q.      But you only heard gunshots while you were on

1    the ground?

2          A.     On the ground and I believe as I was getting

3    up.

4          Q.     Okay.  And did you hear gunshots any other

5    time?

6          A.     No.

7          Q.     Okay.  Did you place the call to request a

8    uniformed police officer or did Officer Olthaus?

9          A.     I think it was me.

10         Q.     Okay.  When you heard the shots that were

11    fired, did they happen one right after the other?

12         A.     There was one like that I heard first, and

13    then a series of other shots.

14         Q.     Okay.  Can you give me some idea of how much

15    time lapsed between the first shot and the series of shots?

16         A.     Not long, maybe a second, maybe less.  But

17    there was a distinct one shot and then a series of shots.

18         Q.     Okay.  When you were walking up to the

19    suspect vehicle, did you know whether or not Mr. O'Neal was

20    alive or dead?

21         A.     As I was walking up to it?

22         Q.     Yes.

23         A.     No.  I didn't know he had been shot at that

24    point.

25         Q.     You mentioned that Officer Smith was on the

1    driver's side of the vehicle as you were walking up.  Was he

2    then securing the driver?

3           A.      No, he was not.

4           Q.      Were you concerned at all for your safety as

5    you were walking up to the suspect vehicle?

6           A.      I was running up to it with my firearm in my

7    hand because I didn't know what was there.

8           Q.      But it was on your side, correct?

9           A.      Yes.

10          Q.      Is that standard knowing that shots are fired

11    to approach the scene of where the shots are fired with the

12    gun to your side?  Or on the other hand, is it standard to

13    approach a scene with a gun aimed ready to fire?

14          A.      There was nothing to aim at at that point

15    that I could see.

16          Q.      Okay.  So to you it was appropriated to have

17    the gun to your side?

18          A.      Yes.

19          Q.      Through your police training, either in the

20    academy or throughout your employment with the police

21    departments, what is -- what are you taught regarding the

22    use of force?

23          A.      There is many different types of use of

24    force.

25          Q.      Okay.  And what type of force is a gun

1    considered?

2          A.     It would be deadly force.

3          Q.     When is it appropriate to use deadly force

4    based your training and experience?

5          A.     When you feel that your life is in danger or

6    the life of someone else is in danger.

7          Q.     Do you believe based off what you observed

8    that prior to the guns -- prior to the shots being fired

9    that you heard, that somebody's life was in danger?

10         A.     My life was in danger.

11         Q.     But you didn't fire the gun?

12         A.     I didn't have an opportunity to.

13         Q.     Okay.  Did you believe then once you heard

14   the shots, that someone was protecting you?

15         A.     Uhm, --

16                MR. HARDIN: I'm going to object.  It calls

17         for speculation, but go ahead.

18                MS. HUFF:  I don't believe it calls for

19         speculation.  I'm asking him what he thought.

20         A.     You have to understand how fast this

21   happened.  It was very fast.  There was not time to sit and

22   ponder what was going on.

23         Q.     (By Ms. Huff)  Have you thought about it

24   since?

25         A.     About what happened?

1        Q.      Yeah.

2        A.      Yeah.

3        Q.      Okay.  Have you thought about at all why

4   shots were fired?

5        A.      I know why shots were fired.

6        Q.      Okay.  Did you see any shell casings near

7   Officer Smith?

8        A.      No.

9        Q.      And you never actually saw who fired shots?

10       A.      I did see Officer Smith firing shots.

11       Q.      You did see Officer Smith fire shots when?

12       A.      As I was getting up.

13       Q.      As you were getting up you saw him firing

14   shots?

15       A.      Yes.

16       Q.      So was this part of the sequential shots?

17       A.      Yes.

18       Q.      Do you believe that he fired the whole

19   sequential shots that you heard?

20       A.      I don't want to speculate.  When I -- as I

21   was getting up, I saw him fire one or two shots.

22       Q.      Okay.  Back to back?

23       A.      Yes.

24       Q.      Okay.  And he was aiming that at the driver

25   of the suspect vehicle?

1        A.      It appeared that way.

2        Q.      And this was when the suspect vehicle was in

3   front of your vehicle still?

4        A.      Yes.

5        Q.      It had just hit it?

6        A.      Yes.

7        Q.      Were you in the aim of fire?

8        A.      I wasn't shot.

9        Q.      Well, that wasn't my question.  Were you in

10  the aim of fire?

11       A.      I don't know what that means.

12       Q.      When you saw Officer Smith aiming towards the

13  driver of the vehicle, firing his gun, were you in his aim

14  of fire?

15       A.      Was he aiming a firearm at me?

16       Q.      No.

17       A.      Could you maybe rephrase the question?

18       Q.      Have you ever been to a shooting range?

19       A.      I have.

20       Q.      When you're shooting down a line, is there an

21  area that you consider to be where you're gun is aiming at?

22       A.      Yes.

23       Q.      What do you call that?

24       A.      Down range.

25       Q.      If Officer Smith was pointing his gun, would

64

```
 1    you have been his down range -- within his down range area?
 2              A.     No.  I wasn't afraid he was going to shoot
 3    me.
 4              Q.     I didn't ask if you were a afraid he was
 5    going to shoot you.  I want to know if you were in his down
 6    range area of where he was pointing his gun?
 7              A.     That doesn't -- the question doesn't make any
 8    sense to me.  What do you consider down range?  Like we
 9    talking like this or this (indicating).
10              Q.     Could you have been shot?
11              A.     I was not shot.
12              Q.     Could you have been?
13              MR. HARDIN:  Objection.  It calls for
14              speculation again, but go ahead if you can answer.
15              A.     I wasn't shot.
16              Q.     (By Ms. Huff)  I understand, but I would like
17    you to answer the question I'm asking.
18              A.     Ask it again.
19              Q.     Could you have been shot based off of the way
20    that Officer Smith was shooting?
21              A.     I guess my answer would have to be, no.
22              Q.     Okay.  Were you aware of any reason for
23    Officer Smith to draw his weapon and begin shooting?
24              A.     I didn't -- I wasn't seeing what Officer
25    Smith saw.
```

```
 1          Q.      Okay.  So you're not aware of any reason?

 2          A.      I'm not aware of anything Officer Smith was

 3   doing.

 4          Q.      Okay.  And you did not fire your gun at all?

 5          A.      I did not.

 6          Q.      Did your vehicle have any type of video or

 7   audio --

 8          A.      No.

 9          Q.      -- surveillance?

10          A.      No.

11          Q.      Were either of you wearing any type of video

12   or audio surveillance?

13          A.      No.

14          Q.      Okay.  I see you brought a notebook with you.

15   Did you review some documents before coming into the

16   deposition today?

17          A.      Yes.

18          Q.      What did you review?

19          A.      I reviewed my transcripts.

20          Q.      Your interviews with internal investigation?

21          A.      Yes.

22          Q.      Okay.  Anything else?

23          A.      No.

24          Q.      Have you spoken to anyone about this incident

25   since your interviews?
```

1      A.      Since my interviews?

2      Q.      Yes, that you said you just reviewed?

3      A.      Just to the lawyers.

4      Q.      Okay.  No one else?

5      A.      Not that I'm aware of.

6              MS. HUFF:  Okay.  All right.  I have no

7      further questions.

8              MR. HARDIN:  Okay.  We'll take just a quick

9      break.

10             MS. HUFF:  Yeah, that would be great.

11     (Deposition concluded at 12:51 and signature NOT waived.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COURT REPORTER'S CERTIFICATE

I, Jennifer Olivier, a Freelance Court Reporter and Notary Public in and for the State of Ohio certify:

That the foregoing deposition of Nathan Asbury, is a true and accurate transcript of the deposition taken before me at the time and place therein set forth at which time the witness was put under oath;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed. I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand at Cincinnati, Ohio on this 2nd day of May, 2014.

_____
Jennifer Olivier
Certified Court Reporter
and Notary Public in and
for the State of Ohio

My Commission Expires:   6/26/15