1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
2             WESTERN DIVISION AT CINCINNATI

3  ------------------------------------ :

4  ANTERNITIA O'NEAL,              :
    ADMINISTRATOR
5          Plaintiff       :

6     vs.                      Case No. 1:12-CV00971

7                      :

8  ORLANDO SMITH, et al.       :  Judge: SPIEGEL

9          Defendant(s)     :

10 ------------------------------------ :

11

12

13      DEPOSITION OF:  RYAN OLTHAUS

14      TAKEN:        By the Plaintiff

15      DATE:         February 13, 2014

16      TIME:         Commencing at 1:00 p.m.

17      PLACE:        Offices of:
                     Hardin, Lazarus & Lewis, LLC
18                 915 Cincinnati Club Building
                     30 Garfield Place
19                 Cincinnati, OH 45202

20     BEFORE:       JENNIFER OLIVIER
                     Certified Court Reporter
21                 Notary Public - State of Ohio

22

23

24

25

```
 1   APPEARANCES:

 2       On behalf of the Plaintiff:

 3
                     DIANE HUFF, ESQ.
 4                        of
                     Eric Deters & Partners P.S.C.
 5                   5247 Madison Pike
                     Independence, KY  41051
 6
 7       On behalf of Defendants:

 8                   DONALD HARDIN, ESQ.
                          of
 9                   Hardin, Lazarus & Lewis, LLC
                     915 Cincinnati Club Building
10                   30 Garfield Place
                     Cincinnati, OH  45202
11   AND

12                   PETER STACKPOLE, ESQ.
                     Assistant City Solicitor
13                   City of Cincinnati
                     801 Plum Street, Room 214
14                   Cincinnati, OH  45202

15                       - - -

16              S T I P U L A T I O N S

17       It is stipulated by and between counsel for the

18   respective parties that the deposition of RYAN OLTHAUS, a

19   witness herein, may be taken at this time by Counsel for the

20   Plaintiff as upon cross-examination pursuant to the Ohio

21   Rules of Civil Procedure; that the deposition may be taken

22   in stenotype by the notary public-court reporter and

23   transcribed by her out of the presence of the witness; that

24   examination and signature of the transcribed deposition by

25   the witness is expressly NOT waived.
```

1        I N D E X

2   RYAN OLTHAUS _____          PAGE

3           CROSS-EXAMINATION BY MS. HUFF          4

4           EXAMINATION BY MR. HARDIN              -

5                         EXHIBITS

6    Exhibit Number              Marked                Refer

7

8     1 Diagram                    29                    29

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        RYAN OLTHAUS
2    being first duly sworn, was examined and testified as if on
3    cross-examination as follows:
4                     CROSS-EXAMINATION
5    BY MS. HUFF:
6           Q.      Good morning, I think it is still or
7    afternoon.
8           A.      Afternoon.
9           Q.      My name is Diane Huff.  I represent the
10   Plaintiff.  Can you please state your full name for the
11   record.
12          A.      It's Ryan Olthaus, R-Y-A-N O-L-T-H-A-U-S.
13          Q.      And Mr. Olthaus, have you done a deposition
14   before?
15          A.      No, ma'am, I have not.
16          Q.      Just to go over a few things real quick prior
17   to getting started.  Please make sure you say everything
18   clearly, because Ms. Olivier is going to be taking every
19   word on the record.  Answer with yes or nos and not uh-huh
20   or huh-uh so that that comes across clearly.  Try not to
21   speak when I'm speaking and I'll try not to speak when
22   you're speaking.  And if you don't understand a question,
23   feel free to ask me to repeat it or rephrase it and I'll do
24   that for you.  Otherwise, I'll assume you understood what
25   I'm asking and your answering the question that is being
```

1   asked.

2           A.      Yes, ma'am.

3           Q.      Okay.  Now, can you please tell me how you

4   got involved with the Cincinnati Police Department.

5           A.      How I got involved with Cincinnati --

6           Q.      When did you start working there?

7           A.      2008.

8           Q.      What did you come on as?

9           A.      PO.

10          Q.      Were you patrol?

11          A.      Yes.

12          Q.      Where did you work at prior to Cincinnati

13  Police Department?

14          A.      I worked at Portman Equipment Company.

15          Q.      Okay.  So this was your first police officer

16  position?

17          A.      Right.  My second academy.

18          Q.      Okay.  And when did you become involved with

19  plain clothes?

20          A.      About three and a half years ago.

21          Q.      Okay.

22          A.      So 2011.

23          Q.      Okay.  And what division did you join?

24          A.      District 4's VCS.

25          Q.      Okay.  Did you have a specific role in that

1    district?

2          A.     In the VCS Unit where all we do predominately

3    showing up to robberies, to drug enforcement, to drug

4    complaints, to helping officers on stops.  I mean, there's

5    -- the role is pretty broad I should say.

6          Q.     And it's all plain clothes?

7          A.     Yes.

8          Q.     Okay.

9          A.     I shouldn't say it's all plain clothes.  The

10    majority of the time it's plain clothes.

11          Q.     And are you still involved with District 4

12    VCS?

13          A.     No, I'm not.

14          Q.     Okay.  What are you doing now?

15          A.     I'm in District 3 patrol.

16          Q.     And you said patrol?

17          A.     Yes, uniform patrol.

18          Q.     Okay.  When did you switch to District 3?

19          A.     Seven weeks ago.

20          Q.     Congratulations.

21          A.     Thank you.

22          Q.     I think.  Is that a congratulatory?

23          A.     Yeah.  I'm from the west side of town.  I

24    like it.  It's nice.

25          Q.     Okay.  Do you recall the evening that the

```
 1    event that brought us here today occurred?
 2         A.    Yes, I do.
 3         Q.    What -- what were you doing that evening in
 4    terms of work?
 5         A.    What were we working on that night?
 6         Q.    Yes.
 7         A.    We were basically buying drugs from Bobbie
 8    Matthews.
 9         Q.    Okay.  And so you had set up the drug buy?
10         A.    Correct.
11         Q.    And what was your role in the drug buy?
12         A.    My role until the drug buy, I was with
13    Officer Asbury.  Half of our unit was -- actually had eyes
14    on the buy and the CI.  Me, Asbury and my sergeant, --
15         Q.    Who is your sergeant?
16         A.    Brian Beechler.
17         Q.    Beechler?
18         A.    Yes, B-E-E-C-H-L-E-R.
19         Q.    Okay.  Okay.  The three of you were doing
20    what?  I'm sorry.
21         A.    We were at the thrift store on Este --
22         Q.    Okay.
23         A.    -- listening to communication.  The vehicle
24    that me and Asbury were in, Officer Asbury and I were in had
25    been used quite a bit.  So the cover on the car had been
```

```
 1    compromised.   So we sat back on Este.

 2          Q.      Is it normal to sit back?

 3          A.      Yeah.   You normally have two teams.

 4          Q.      Could you observe what was happening with the

 5    drug by?

 6          A.      Could we?

 7          Q.      Uh-huh.

 8          A.      No.   We were in direct communication on C

 9    with the other unit who had actually had eyes on it.

10          Q.      And was Sergeant Beechler in a separate

11    vehicle?

12          A.      Yes, he was.

13          Q.      Right next to you guys?

14          A.      Yes.

15          Q.      Okay.   Were you guys on the same wave of

16    communication or were you communicating between the

17    vehicles?

18          A.      What are you -- I don't understand.

19          Q.      Were each of you receiving communication?

20          A.      Yeah, each of us get -- each of us have our

21    own radio.   Everybody gets communication.

22          Q.      Okay.   And was Sergeant Beechler in charge of

23    the drug buy that night?

24          A.      Yeah.   He was the supervisor in charge.

25          Q.      Okay.   And how did the drug buy go?
```

1        A.     Great.

2        Q.     Everything happened how you wanted it to?

3        A.     Uh-huh.

4        MR. HARDIN:  You'll have to give a yes or no.

5        A.     Yes.  I'm sorry.

6        Q.     (By Ms. Huff)  And what happened after the --

7 actually let me ask you this.

8        A.     Uh-huh.

9        Q.     Who -- who from the suspect vehicle was

10 involved in the drug buy, do you know?

11        A.     Robert Matthews, Bobbie Matthews.

12        Q.     What role did he have?

13        A.     He actually sold the heroin to the CI.

14        Q.     Okay.  And did the CI relay any other

15 information to you, other than Matthews had sold him heroin?

16        A.     I want to say that there was some

17 communication through the CI from the officers that were

18 actually at the -- at the buy to us, that there was another

19 suspect in the car that had a pretty substantial amount of

20 dope or heroin.

21        Q.     Okay.  Did they tell you which suspect that

22 was?

23        A.     I cannot remember.

24        Q.     Okay.  Did you know how many suspects there

25 were at the time?

 1          A.      I believe that we knew there were three

 2   because of the CI.

 3          Q.      Okay.  Did you know where Bobbie Matthews was

 4   sitting in the vehicle?

 5          A.      I did not.

 6          Q.      Okay.

 7          A.      I did not.

 8          Q.      Did you become aware of that at a later time?

 9          A.      Yes.  After all the -- after the whole

10   situation happened, yes.

11          Q.      Okay.  So the whole time you did not know?

12          A.      I didn't have a clue the whole time until

13   shots were fired and everybody was out of the car, what was

14   going on.

15          Q.      Did you know Mr. Matthews?

16          A.      Yes, I did.

17          Q.      How so?

18          A.      Because we had purchased drugs from him

19   several other times.  He's ran from us or me personally.  So

20   that's how we -- we were doing a -- it was basically the buy

21   that day was an ongoing drug investigation to where we had

22   purchased drugs from him prior.  And that was the day that

23   we were going to lock him up.

24          Q.      Okay.  So he was your target?

25          A.      Yes.

1          Q.      Did you know any of the other suspects?

2          A.      No, I did not.

3          Q.      Even after you learned who they are, you

4    don't recall if you had any?

5          A.      No one-on-one, no.  I have not.

6          Q.      Okay.  So what did you do at the stop after

7    it was finished, after the drug buy?

8          A.      After the drug buy?

9          Q.      Yes.

10         A.      We started following a black -- I can't

11   recall if it was a Nissan or Honda.  I think it was a Honda,

12   a black Honda, putting out traffic on our radio for us to

13   get a uniform car.

14         Q.      Okay.

15         A.      So we could get him stopped.

16         Q.      Are why did you decide to follow the black

17   Honda, which I'll probably refer to as the suspect vehicle?

18         A.      Okay, the suspect vehicle, because our CI had

19   just purchased heroin from someone in that vehicle.  So our

20   whole thing that we were trying to do is get a uniformed car

21   to stop it so we could arrest Bobbie Matthews because he was

22   in it.

23         Q.      Okay.  So that was the next step was to --

24         A.      To get a uniformed car to get it stopped so

25   we could arrest Bobbie Matthews.

1      Q.      And to maintain observation of the suspect

2    vehicle?

3      A.      That is why we were following it, yes.

4      Q.      Right.

5      A.      So we could put it out on the radio where it

6    was going because procedurally in a plain clothes vehicle,

7    Cincinnati Police are not allowed to do a traffic stops.  So

8    we had a calling for a uniform car to do a traffic stop.

9      Q.      Is there ever a time where you secure a

10   uniform car to make a stop prior to calling them out?  And

11   what I mean by that, before you had done the drug buy as you

12   were setting it up --

13     A.      Uh-huh.

14     Q.      -- is there ever a time?  Or could you --

15   well, let me ask you first.  Is there ever a time that you

16   would have a uniformed police officer on standby -- an

17   assist vehicle that would assist with the stop.

18     A.      In our -- with our unit, yes.  Sometimes no,

19   like if we're doing a big search warrant.  But with the

20   staffing that we have in the districts right now, it wasn't

21   feasible.  Sometimes, it depends if have you 15 people

22   working on a relief you can go ahead and do that, but then

23   sometimes you only have 10 people on a relief and you're not

24   going to be able to secure that person for the time you have

25   them.

1      Q.      Okay.  So you knew going in that you would

2  have to radio to get a uniformed officer to make a stop?

3      A.      I would say possibly, yeah, but the whole

4  thing is why we didn't secure one prior to that, you don't

5  know with these drug buys how they are going to go.  You

6  don't know if he's going to sell not sell.  You just never

7  know.

8      Q.      Okay.

9      A.      And the thing is as well is, I can't say if

10  Bobbie -- if Bobbie said he did sell the dope and just

11  started to walk.  We're allowed to get out on him and at

12  that point, but I can't -- a moving vehicle, I cannot stop

13  with a plain clothes car.

14      Q.      So there was a drug sale that happened.  So

15  at that point did somebody tell you to radio for a uniform

16  police officer?

17      A.      No, it was -- it was -- I don't know who made

18  the call.  But after we heard that there was a substantial

19  amount of heroin in the vehicle, we just decided to make the

20  stop.  So we did radio for a car and give them an update

21  where we were going.

22      Q.      But did you make the call?

23      A.      Did I make the call to get the uniform car?

24      Q.      Yeah.

25      A.      No.

        Q.      But somebody else did?

        A.      Yeah.

        Q.      And do you know who responded to the call out

for a radio -- or for a uniform?

        A.      A uniform, first was a -- who was supposed to

be coming to our location on Mitchell was a female.  I do

not recall who it was.  But further on in us tailing the

vehicle, the suspect vehicle as you call it, towards the end

of it, Officer Smith said that he was close by and that he

could make the stop, because the route that we went up

through Avondale, the first car, uniform car, came the other

way.  So -- but anyway, he did --

        Q.      Officer Smith?

        A.      Officer Smith did respond to it.

        Q.      Okay.  And who was driving the vehicle that

you were in?

        A.      Officer Asbury.

        Q.      And you were in the passenger seat?

        A.      Correct.

        Q.      Did you guys have any conversations while

tailing about what was going to happen next, make a plan,

anything like that?

        A.      Huh-uh, there was --

        Q.      And can you says yes or no.

        A.      There was no talk.  We were just basically

15

1    trying to make sure we had the streets correct and making

2    sure where he was going telling them to watch.  I mean

3    nothing.

4            Q.        So the whole time you're on the radio

5    radioing where your location was at?

6            A.        Correct, correct.

7            Q.        And you ended up on Burton Avenue?

8            A.        Correct.

9            Q.        And what happened when you got onto Burton?

10           A.        When we were on Burton, Officer Smith and his

11   patrol car basically went in front of us.  The suspect

12   vehicle acted like it was going to come to a stop.  It

13   didn't.  He had -- Officer Smith actually --

14           Q.        I just want to stop you real quick.  I know

15   Officer Smith is here today, but can you just use his name,

16   so that on the record we know who you're talking about?

17           A.        Yeah.

18           Q.        Okay.

19           A.        Officer Smith activated his lights and siren,

20   tried to pull over the vehicle.  The vehicle wouldn't stop.

21           Q.        Okay.  When you were on Burton and Officer

22   Smith pulled up, you said he pulled up in front of you?

23           A.        Yeah.

24           Q.        He went around you?

25           A.        When we were on Greenwood.

16

```
 1          Q.      Greenwood, I'm sorry.

 2          A.      Greenwood and then Reading Road goes north

 3   south.  Officer Smith was on Reading Road when we were on

 4   Greenwood.  The suspect vehicle took a left, southbound onto

 5   Reading Road -- or excuse me, northbound onto Reading Road,

 6   and then eastbound onto Burton where Officer Smith seen the

 7   vehicle, seen us behind it, knew the license plate from us

 8   putting it out on the radio, came northbound on Reading Road

 9   at that light and then went eastbound on Burton and cut in

10   front of us so he could make the stop.

11          Q.      So Officer Smith passed you going northbound

12   on Reading and you pulled out left to northbound on Reading

13   following Officer Smith and then going east onto Burton?

14          A.      Correct.

15          Q.      Okay.  And when you got on to Burton, did you

16   stop or did all the cars keep moving?

17          A.      We all kept moving.

18          Q.      Okay.  And you mentioned that it looked like

19   the suspect vehicle was going to stop?

20          A.      There was -- excuse me there was maintenance

21   of some sort going on there and it was hard for us to see.

22          Q.      Maintenance, meaning construction?  Street

23   construction?

24          A.      Yeah, like construction or barrels.  I can't

25   remember.  There was some sort of obstruction like that
```

1    there.  So when Officer Smith proceeds to go down Burton the

2    car slows down, but then takes off again.

3           Q.     Okay.

4           A.     So it never came to a complete stop.  It just

5    slowed down and acted like it was going to pull over and

6    kept going.

7           Q.     And did you and Officer Asbury stay behind

8    Officer Smith this whole time?

9           A.     Uh-huh.  Yes, ma'am.

10          Q.     And did the vehicle end up coming to a stop,

11   the suspect vehicle?

12          A.     I -- it did after the whole situation, but

13   not during the initial stop.  I wasn't in the vehicle for

14   the whole pursuit.

15          Q.     Okay.  So tell me what happened when you guys

16   pull onto Burton.

17          A.     Okay.  We're going down Burton.  Officer

18   Smith activates his lights and siren.  The car does not stop

19   We're going down Burton.  Burton crests at the top of the

20   hill.  We start going down to the bottom of the hill where

21   it dead ends eastbound.

22          Q.     Are you familiar with this street?

23          A.     Yes.

24          Q.     So you knew it was a dead end?

25          A.     Yes.

18

1      Q.      Okay.

2      A.      As we're going down the street, the right

3  front passenger of suspect vehicle bailed out of the car

4  while it's still moving.

5      Q.      Okay.

6      A.      I bail out of our CC car.

7      Q.      While it's still moving?

8      A.      Yeah.  I mean, we're going -- this is at the

9  crest.  It's going down toward the dead end, so people were

10  -- Asbury was slowing the car down.  I still jump out of the

11  car while it's still moving.

12      Q.      How fast were you going?

13      A.      I don't know, two, three miles an hour.  I

14  mean, it was not like we were going 15 or 10.  It was slow.

15      Q.      Okay.  So you saw a passenger get out of the

16  front passenger door --

17      A.      Uh-huh.

18      Q.      -- of the suspect vehicle.  Were you able to

19  see if he had anything in his hands?

20      A.      As he was running -- as I was running

21  eastbound on Burton, he was running westbound on Burton and

22  we were coming together.  Again it was twilight.  I couldn't

23  see.  He was going like this with his hands (indicating).  I

24  was yelling at him to show me his hands and then he went

25  down.  He headed southbound down the stairwell.

1      Q.      Okay.  I want to make sure I have it right.

2   Your vehicle is behind Officer Smith, who is behind the

3   suspect vehicle?

4      A.      Correct.

5      Q.      And you see a person jump out of the

6   passenger side door of the suspect vehicle?

7      A.      Yes, the front seat passenger.

8      Q.      Yeah, the front seat passenger door, they

9   jump out of and they start running westbound back toward

10  your vehicle?

11     A.      Correct.

12     Q.      And you're jumping out of your vehicle at the

13  same time when you observe this?

14     A.      Well, I'm behind him, but I'm -- as soon as

15  they jump out and start running, I get out --

16     Q.      -- you jump --

17     A.      -- of my vehicle --

18     Q.      -- out and --

19     A.      -- and I started running at them.

20     Q.      So you two are running toward each other?

21     A.      Correct.

22     Q.      And is that along the vehicles then?

23     A.      This ma'am, was on the sidewalk.

24     Q.      Okay.  What I mean is, are all the vehicles

25  facing eastbound?

```
 1          A.      Yes.

 2          Q.      Okay.  So your running along the sidewalk

 3   next to the vehicles on the eastbound side of vehicles?

 4          A.      Correct.

 5          Q.      Okay.

 6          A.      I'm actually on the north side of vehicles.

 7   They are heading east.  Excuse me.  I'm on the south side of

 8   the vehicles.

 9          Q.      Okay.  Correct, yes.

10          A.      Yeah.

11          Q.      Okay.  So you're on the south side of

12   vehicles?

13          A.      Correct.

14          Q.      You're running eastbound?

15          A.      Correct.

16          Q.      The suspect is running west?

17          A.      Correct.

18          Q.      And you see him doing something with his

19   hands in the front of him?

20          A.      Yeah.  He's going like this (indicating),

21   like he's stuffing or pulling.

22          Q.      Near his belt area?

23          A.      Yeah, near his mid section, near his

24   waistband.

25          Q.      At that time had you drawn a weapon?
```

1    A.    Yes, I did.

2    Q.    And why did you draw your weapon?

3    A.    Why did I draw my weapon?

4    Q.    Yes.

5    A.    I couldn't see. I told him several times to

6    show me his hands. He was given -- he was -- I couldn't

7    see. I was -- in this situation, usually Bobbie Matthews is

8    -- has been known to carry guns. So I was thinking that

9    there was a gun in the vehicle. He would not show me his

10   hands. I was getting to the point where I was starting to

11   fear like something was going for happen and I needed to

12   protect myself.

13   Q.    Let me back track to something you just

14   brought up.

15   A.    Uh-huh.

16   Q.    Bobbie Matthews was known to carry guns.

17   A.    Uh-huh.

18   Q.    On past run-ins that you had with him, did he

19   have guns on him?

20   A.    No, but in intelligence gathering from other

21   -- other groups within the department, it was -- it was

22   known that he was -- he's been known to carry guns.

23   Q.    Had he ever to your knowledge fired a gun?

24   A.    I don't know.

25   Q.    Okay. Now, did you use verbal commands

22

1   toward the passenger that had jumped out and is now running

2   toward you?

3          A.      Yes.

4          Q.      You used verbal commands prior to pulling out

5   your gun or as you're pulling out your gun?  Can you kind of

6   explain the order that happened in?  I'm sure it happened

7   quick, but --

8          A.      I was -- I'll tell you, it was pretty much

9   the same time.  I don't remember.  I remember him jumping

10  out, me yelling at him to stop.  And I mean, I can't tell

11  you if it was -- it was pretty much the same time.

12         Q.      Did you ever actually see a gun?

13         A.      Did I see his gun?  No.

14         Q.      So you didn't know whether or not he actually

15  had a gun?

16         A.      No.

17         Q.      Okay.  And did you confront him?

18         A.      He actually made it -- like I said, he was

19  going southbound down the stairwell.  That's when I heard

20  the shots and that's when I went towards where I heard the

21  shots?

22         A.      Okay.  From the time that you jumped out of

23  the vehicle that Officer Asbury was driving, were you aware

24  of what Officer Asbury was doing?

25         A.      No, I was not.

```
 1            Q.      Okay.  Were you aware of what Officer Smith
 2    was doing?
 3            A.      No, I was not.
 4            Q.      Okay.  When you jumped out of the vehicle,
 5    was Officer Smith still in his vehicle?
 6            A.      I think he was getting out of his vehicle.
 7            Q.      So he had stopped and put it in park?
 8            A.      I can't -- I was -- as I was running, I can't
 9    see these guys.
10            Q.      Okay.  I'm asking before you started running,
11    I guess.  I'll clarify that.  You're behind Officer Smith
12    and you see this guy jump out.  You said the vehicle was
13    still moving at a slow pace?
14            A.      Correct.
15            Q.      Two or three miles an hour.  Do you know if
16    Officer Smith's vehicle was still moving?
17            A.      When I was getting out of my vehicle?
18            Q.      Yeah, at that time.
19            A.      At that time everybody was still moving.
20            Q.      Okay.  So you didn't see him stop and get out
21    of his vehicle?
22            A.      No.
23            Q.      Okay.  You were running, chasing after the
24    suspect.  Okay, say yes or no.
25            A.      Yes, ma'am.  Sorry.
```

1          Q.      That's okay.  And you heard shots fired?

2          A.      Yes, ma'am.

3          Q.      Was your back toward the direction of where

4    the shots were being fired?

5          A.      Yes.

6          Q.      Do you know or can you remember how many

7    shots were fired?

8          A.      No, ma'am.

9          Q.      Do you remember the frequency of the shots,

10   meaning were they bam, bam, bam, one after another?

11         A.      I can't remember.  I can't remember.  I

12   believe that there were -- I mean, no, I can't say that I do

13   remember.

14         Q.      Okay.  Let me ask you this.  When the suspect

15   was running westbound toward you --

16         A.      Uh-huh.

17         Q.      And you're running eastbound towards the

18   suspect, at some point he drops off and runs south.  Do you

19   know if you were still near Officer Smith's vehicle or the

20   suspect vehicle?  Was it still to your left?

21         A.      It was still --

22         Q.      On the northbound side?

23         A.      Yeah, it was still to the left of me and I

24   would say I was in close proximity to it because the sirens

25   were real loud.  I mean, yeah.

1       Q.      So you're still in close proximity?

2       A.      Yes.

3       Q.      Did you follow south at all or had the shots

4  been fired before you started following south.

5       A.      The suspect was already going south.  He was

6  going down a stairwell.  I heard shots and directed

7  attention toward the shots because that guy wasn't a danger

8  anymore.  I wanted to make sure that everything was all

9  right with -- with Officer Smith.

10      Q.      Okay.  So you never made it down the steps?

11      A.      No, I did not.

12      Q.      And you turned around and what did you

13  observe?

14      A.      At that point I Observed the car, suspect

15  vehicle, excuse me, coming to a slow stop and Officer Smith

16  up on target.

17      Q.      Okay.

18      A.      On his -- on his police radio calling for

19  fire and other cars.

20      Q.      Where was the suspect vehicle at that time in

21  relation to the vehicle that you had come out of, Officer

22  Asbury's vehicle and Officer Smith's cruiser?

23      A.      Ask it the question again, please.

24      Q.      Okay.  Let me ask you this.  Were all the

25  cars still facing eastbound?

26

1        A.        They were all still facing eastbound.

2        Q.        Where was the suspect vehicle in relation to

3    Officer Smith and Officer Asbury's vehicles when you turned

4    around and saw it come to a stop?

5        A.        Officer Asbury's vehicle was here,

6    (indicating) was the one that was the furthest.

7        Q.        West?

8        A.        West and then it was the suspect vehicle and

9    then Officer Smith's patrol car.

10        Q.        Okay.  So prior to that though, the suspect

11    vehicle was in front of Officer Smith's car?

12        A.        Correct.

13        Q.        So did you observe at all the suspect vehicle

14    moving backwards?

15        A.        No, I did not.

16        Q.        Did you ever -- did you observe at all if

17    ever turn around?

18        A.        No, I did not.

19        Q.        So you don't know how it got back?

20        A.        Correct.  I don't know.

21        Q.        Did you ever observe the suspect vehicle hit

22    Asbury's vehicle?

23        A.        No, ma'am.

24        Q.        Did you hear it?

25        A.        I believe I did hear a crash or an impact of

```
 1   something, but I didn't see it.  I didn't know until later
 2   on that the actual -- there was an auto accident.
 3        Q.     Okay.  Do you know at what point you heard a
 4   crash was it while you are chasing?
 5        A.     I think while I was running, yes.
 6        Q.     Okay.  So was it before the shots were fired
 7   then?
 8        A.     Yes.
 9        Q.     Once you turned around were shots still being
10   fired?
11        A.     No, ma'am.
12        Q.     And you said you observed Officer Smith in
13   aim?
14        A.     Yes, on target.
15        Q.     On target, thank you.  And who was his
16   target?
17        A.     The front seat, excuse me.  The front -- the
18   driver of the suspect vehicle, sorry.
19        Q.     Okay.  And did you observe Officer Asbury's
20   location when you turned around?
21        A.     Yeah.  When I scanned I believe that he was
22   to the left of me putting Bobbie Matthews in custody or
23   coming from that general direction, the west -- up the
24   street by his -- by our vehicle.
25        Q.     So he was still near your vehicle?
```

1          A.       Yeah.

2          Q.       Was he on the south side of the vehicle or

3    the north side?  The south side being the passenger side and

4    the north side being the passenger side.

5          A.       I couldn't even tell you.  I don't know.  I

6    don't remember.

7          Q.       From where you were standing, if he was on

8    the driver's side, would you have been able to see him

9    because you were on the south side?

10          A.       Yeah.  I would be able to see over the

11    vehicle.  I would be able to he see him.  I think he was on

12    the north side of the street, but I'm not positive.

13          Q.       Okay.  So when you turned around, he was

14    already over by Bobbie Matthews?

15          A.       Yes.

16          Q.       Okay.

17          A.       And that was actually behind me, the way that

18    the -- the way that the steps are, the steps come up here on

19    the south side.  And this is where the west -- excuse me.

20    The eastern point is where the shooting happened.  Asbury

21    was actually behind me to the east side to the north.

22          Q.       The east side?

23          A.       The north eastern side I would say.

24          Q.       The direction the cars were facing, the east

25    way?

1          A.      No, okay.  I'm getting this completely

2     confused and I apologize.  He was on the northwestern side

3     which was -- which would have been behind me to my left on

4     the north side up here where Bobbie was at.

5          Q.      Okay.

6          A.      Sorry.

7          Q.      Let me do this.  I'm going to mark this

8     Exhibit 1.  Do you recognize this?

9          A.      Yes.

10         Q.      And do you know who produced this document?

11         A.      No.

12         Q.      Okay.  Does that look like a good rendition

13    of where the cars were parked?

14         A.      Correct.

15         Q.      And can you mark on there the north, south,

16    east and west?

17         A.      Okay.  This would be north.  This would be

18    east.  That would be south, and that would be west

19    (indicating).

20         Q.      Where are these steps?

21         A.      The these steps are about here (indicating).

22         Q.      Okay.  Can you write steps there?

23         A.      Uh-huh.

24         Q.      Okay.  And where is officer Asbury?

25         A.      Asbury is over here (indicating).

1          Q.     Okay.  And at that time was the suspect

2   vehicle in the location of one of the cars that you see on

3   that drawing?

4          A.     Excuse me?

5          Q.     Was the suspect vehicle in the position as

6   you see it on that drawing?

7          A.     I believe so, yes.  Facing east, yes.

8          Q.     Okay.  And is the suspect vehicle marked

9   correctly on that?

10         A.     Yes, right here (indicating).

11         Q.     Okay.  And where was Officer Smith?

12         A.     Officer Smith was over here (indicating).

13         Q.     Okay.  And he was aiming at the driver?

14         A.     Correct.

15         Q.     Okay.  And what -- what did you do after you

16   saw them?  After you turned around and saw Officer Smith,

17   and Officer Asbury, what was you are next step?

18         A.     After I saw that Officer Smith was still on

19   target, I proceeded.  There was a car right here.  So I

20   proceeded to go over here and start to make sure everything

21   was okay with him and clear the car.

22         Q.     Okay.  So there was a car parked on the south

23   curb near the steps?

24         A.     Yeah, somewhere around here (indicating).

25         Q.     And was that car blocking your view at all of

1    what was going on?

2           A.      No, no.

3           Q.      So you could see?

4           A.      Yes.

5           Q.      And so you approached the suspect vehicle?

6           A.      Correct.

7           Q.      What -- was Officer Smith moving toward the

8    suspect vehicle also?

9           A.      He was standing here on target, radioing for

10   cars and fire.

11          Q.      Okay.  Where did you go when you approached

12   the suspect vehicle?

13          A.      The other side.

14          Q.      The other side being?

15          A.      The passenger side.

16          Q.      Okay.  And was the passenger door open?

17          A.      The passenger door open, yes, it was.

18          Q.      It was open.  And did you -- did you observe

19   anything in the car around the car?

20          A.      There was -- there was -- you want me to tell

21   you what I observed in the car.

22          Q.      Yes, or around the car if you observed it?

23          A.      The driver had been shot.  He was laying over

24   the passenger seat.

25          Q.      Which way was he leaning, toward his right or

1    toward his left?

2         A.    Towards his right.

3         Q.    Okay.

4         A.    And there was a --

5         Q.    You're making a movement with your arm.  Did

6    he have his arm out?

7         A.    Yeah, he had his arm out.

8         Q.    Which arm?

9         A.    His right.  There was -- and I -- I mean,

10   right within finger length there was a black semi automatic

11   handgun.

12        Q.    Okay.  Do you know what type of a handgun?

13        A.    No, I do not.

14        Q.    Did you grab the gun?  Did you do anything?

15        A.    I did not.

16        Q.    Okay.  But the gun was not in his hand?

17        A.    No, but it was in -- I mean, close proximity.

18        Q.    Okay.  How was the gun facing?

19        A.    It was facing towards the seat or excuse me,

20   the door -- the passenger door, which would be to the south

21   side or the right side.

22        Q.    Meaning that the handle was toward his hand

23   and the muzzle was --

24        A.    Correct.  And you the muzzle was out toward

25   the door.

1      Q.      And did you still have your gun drawn at this

2  time?

3      A.      Yes, I did.

4      Q.      Did you have it up at aim?

5      A.      Yes, I did.

6      Q.      Who were you aiming it at?

7      A.      I was aiming it at the driver of the vehicle.

8      Q.      Okay.  And did you observe Officer Asbury

9  doing anything else during this time?

10      A.      While this was happening and I had my firearm

11  pointed at the driver, Officer Asbury came and met me at the

12  passenger front door.  I still had him at gun point.  The

13  driver was still alive at that point.  So Officer Asbury

14  grabbed the firearm while I still had him at gun point and

15  put it on the roof of the car.

16      Q.      And Officer Smith was still on the driver's

17  side of the vehicle with his gun aimed at the driver as

18  well?

19      A.      Correct.

20      Q.      And was the driver inside the vehicle?

21      A.      Yes, he was.

22      Q.      Okay.  Was the driver's side door open or

23  closed?

24      A.      It was open.

25      Q.      Do you know who opened the door?

34

1      A.      No, I do not.

2      Q.      Okay.  Did you observe at all Mr. Matthews

3  getting out of the vehicle?

4      A.      No.  No, I did not.

5      Q.      Did you ever observe the driver getting out

6  of the vehicle?

7      A.      No, I did not.

8      Q.      Okay.  What did you do after Officer Asbury

9  took the gun and placed it on the top of vehicle?

10      A.      We cleared the rest of the car.

11      Q.      What does that mean?

12      A.      Make sure there was nothing else that could

13  do harm to us, cleared it.

14      Q.      Was there anything else?

15      A.      That I could see, no.  My whole point was I

16  wanted to make sure that there was no other firearms or

17  suspects in there that could do any harm to any officers.  I

18  was thinking about officer safety.  So, we waited for fire

19  to come.

20      Q.      Okay.  So while you were clearing out the

21  vehicle for other weapons, did you observe any shell casings

22  in the vehicle?

23      A.      I did not.

24      Q.      Okay.

25      A.      And what I mean by search, this is basically

1   a glance to make sure it's -- I'm just glancing in making

2   sure everything is fine.

3           Q.      Only a visual search?

4           A.      Yes, correct.

5           Q.      And was -- what did you do after you did that

6   clear?  Did you stay on the passenger side as you were

7   calling for fire?

8           A.      I stayed on the passenger side.  Other

9   officers showed up and at that point Officer Smith

10  complained of chest pains and that's when I stripped him

11  down and made sure he was not shot or injured.

12          Q.      Did you observe any injuries on him?

13          A.      No.

14          Q.      Had you heard Officer Smith say anything else

15  during the incident?

16          A.      No.

17          Q.      Okay.  Had Officer Asbury said anything

18  during that time?

19          A.      No.

20          Q.      Did you ever hear Officer Smith make verbal

21  commands to the passengers in the vehicle?

22          A.      I did not.

23          Q.      Okay.  Did you --

24          A.      Only because --

25          Q.      Go ahead.

1        A.       Well, the sirens are so loud when you're up

2   close, you couldn't hear anything.

3        Q.       Okay.  Did the sirens remain on?

4        A.       They remained on.  And then I did turn them

5   off when everything was okay and secure because for radio

6   traffic purposes.

7        Q.       Okay.  Did you turn them off then after you

8   did the visual clear of the vehicle?

9        A.       Yes, yes.

10       Q.       At that point?

11       A.       Yes.

12       Q.       Okay.  Did your vehicle that you were in with

13  Officer Asbury have any type of surveillance, audio or

14  video?

15       A.       No.

16       Q.       Did you have any on you, audio or video?

17       A.       No.

18       Q.       Do you know if Officer Smith's video or audio

19  was on?

20       A.       I don't know if it was on or not.  It should

21  be.  The way that our cameras work in our cars is as soon as

22  you turn the lights and sirens on, the camera automatically

23  boots -- boots up.

24       Q.       So when you turn the lights off you also

25  turned off the camera?

1        A.     No, because what it does is when you turn the

2  lights off, you have to manually stop the camera.

3        Q.     Okay.  So did anyone stop the camera?

4        A.     That I seen, no.

5        Q.     Okay.  Who set up the controlled drug buy

6  with Bobbie Matthews?

7        A.     Someone in my unit.  I don't know

8  specifically who did.

9        Q.     Okay.  And you said that is something that

10  you were planning for some time?

11        A.     No, I wouldn't say some time.  I mean, we

12  were during -- we were in the middle of the investigation

13  and we had a CI that could buy from him.  So we brought it

14  up pretty much that morning.

15        Q.     Okay.  But you had mentioned there were a few

16  times prior that he purchased, but you didn't arrest at

17  those times?

18        A.     Correct.

19        Q.     Why not?

20        A.     Just to build a stronger case.

21        Q.     Okay.  Is that standard?

22        A.     In our unit, yes.

23        Q.     Okay.  I just want to ask again, I think I

24  asked this before.  You never observed Officer Smith getting

25  out of his vehicle, correct?

1      A.      Like I said, in glancing I might have, but I

2  can't -- I can't recall.

3      Q.      Okay.  And in terms of the lights and the

4  camera, how they sync, can you turn the camera off while the

5  lights are on?

6      A.      Yes, I think you can, but I think -- or

7  excuse me.  You can't, no.  When the lights are on -- when

8  the lights and sirens are on, you can't turn them off.

9      Q.      Okay.

10      A.      Because what it does is you manually stop it

11  and then it just kicks right back on.

12      Q.      Because the lights and sirens are still on?

13      A.      Yeah.

14      Q.      So there would be just a short lag?

15      A.      Yeah.

16      Q.      So when the lights and sirens are off, you

17  can manually turn it off?

18      A.      Correct.

19      Q.      And that's the only way to turn it off?

20      A.      Correct.

21      Q.      Have you talked to Officer Smith about this

22  incident since it happened?

23      A.      Not about any of the -- I should say it's

24  about the investigation, basically what we're doing right

25  now.  I asked him when his time is and things like that,

1    nothing about the case.

2          Q.        How about Officer Asbury?

3          A.        Same thing.

4          Q.        Did Sergeant Beechler follow you guys to the

5    scene?

6          A.        The scene to --

7          Q.        On Burton Avenue?

8          A.        No, he did not.

9          Q.        Okay.

10         A.        He was actually meeting with the confidential

11   informant.

12         Q.        Okay.  Does the supervisor have to be there

13   to make an arrest?

14         A.        No.

15         Q.        Okay.  When you heard the shots being fired,

16   could you tell if they were all from the same spot or

17   whether they were shots back and forth?

18         A.        No, just sounded like a succession of shots.

19         Q.        Okay.  So they happened successively, like

20   back to back?

21         A.        Well, yeah.  I don't remember if it was like

22   -- yes, it was all together.  It was all pretty much one big

23   bang.

24         Q.        Do you want to stop clicking your pen?

25         A.        Yeah, sorry.

40

1      Q.      When you turned around and saw the suspect

2  vehicle next to Officer Asbury's vehicle, and Officer Smith

3  was aiming at the driver, correct?

4      A.      No.  What?  Say that again.

5      Q.      When you turned around, where was the suspect

6  vehicle when you first turned around after chasing the

7  passenger that had jumped out?

8      A.      Right when I jumped out of vehicle, it was

9  all -- it was still the suspect vehicle, Officer Smith's

10  vehicle and then our vehicle.

11      Q.      Okay.  And then you heard shots fired and you

12  turned around?

13      A.      Correct.

14      Q.      And where was the suspect vehicle?

15      A.      Behind.  It was to the left - or excuse me.

16  It was behind Officer Smith's vehicle.

17      Q.      Okay.  And next to Officer Asbury's?

18      A.      It wasn't next to officer Asbury's.  I think

19  Officer Asbury's was behind it a little bit.

20      Q.      So it was right in front of Officer Asbury's?

21      A.      Right in front of Officer Asbury.

22      Q.      Did you observe Officer Smith at that time?

23      A.      When I -- when I first -- when I turned

24  around, yeah.  He was still on target at the driver.

25      Q.      And so at this point, based off this map,

41

```
 1    would he have been pointing southwest?
 2         A.    It would be south if he's pointing at the
 3    driver.  Are we still talking about Officer Smith?
 4         Q.    Yes, not in the position that they are on
 5    that drawing, but at the time you said you turned around and
 6    the suspect vehicle was right in front of Officer Asbury's
 7    vehicle?
 8         A.    I'm still --
 9               MR. HARDIN:  I'm just going to object.  I
10         don't understand the question.
11         A.    Yeah, yeah.  I don't understand it either.
12         Q.    (By Ms. Huff)  Okay.  Let's start over.  When
13    you turned around, when you first heard the shots, that's
14    what made you turn around?
15         A.    Correct.  Right here (indicating).
16         Q.    Where was the suspect vehicle?
17         A.    It was coming to a stop here (indicating).
18         Q.    So it was there?
19         A.    Yes.
20         Q.    It was not over here by the Officer Asbury's
21    vehicle?
22         A.    No, it was not.
23         Q.    Okay.  So you observed Officer Smith aiming
24    to the east towards the driver of the suspect vehicle?
25         A.    Correct.
```

1    Q.  And so did you ever observe the suspect

2 vehicle as it -- at the time it crashed Officer Asbury's

3 car, did you observe that crash?

4    A.  No, I did not.

5    Q.  Did you ever see the car right after the

6 crash or as it was right in front of Officer Asbury's

7 vehicle?

8    A.  No, I did not.

9    Q.  Okay.  Did you ever see the suspect vehicle

10 moving from Officer Asbury's vehicle to the location to the

11 north side?

12    A.  I seen no part of the crash whatsoever.

13    Q.  Okay.  So when you turned around, the car was

14 already in an almost stopped position at the northbound curb

15 facing east?

16    A.  Yes, going -- continuing forward.

17    Q.  And did it hit this parked car in front of

18 it?

19    A.  I believe it did.  That's how it came to

20 rest.

21    Q.  Okay.  Did you observe any casings near

22 Officer Smith?

23    A.  No, I did not.  I'm not saying there weren't

24 any there, but I just didn't observe them.

25    Q.  And when you checked him for injuries, where

1     did you do that at?

2           A.      Behind the car, right where he was standing.

3           Q.      Okay.   So had he --

4           A.      Actually it was probably further back here

5     because the paramedics and everything were trying to do

6     their thing.

7           Q.      So had he moved at all from the time that you

8     saw him standing at the driver to the time that you were

9     checking him, other than backwards?

10          A.      No.

11          Q.      So he never moved up to the car?

12          A.      That I seen?  He was up towards the vehicle

13    on aim giving -- I mean, doing things, but I mean, he never

14    was -- I don't know what you're trying to -- what you're

15    trying to say.  Did he walk up to the car?  Yes, he had to

16    walk up to the car.

17          Q.      Okay.

18          A.      But that's -- this right here is right behind

19    or right next to the driver's door.   That's the area that he

20    was in.

21          Q.      Okay.   When you first saw -- turned around

22    and saw him in aim at the driver, how far away was he from

23    the driver's side door?

24          A.      Proximity at that point, maybe two feet, four

25    feet, somewhere in that area.  I mean, not very far, two -

44

1    three feet.

2         Q.    Okay.  And that was right after the shots

3    were fired, correct?

4         A.    Yeah, but the whole thing is, is when the

5    shots were fired, I turned around and where I was looking at

6    -- I'm not trying to say anything about Officer Smith, but

7    he's a shorter guy.  I couldn't see directly, you know what

8    I mean, how far away he was directly there.  By the time I

9    actually got up to the vehicle, he was two or three feet

10   away.

11        Q.    Okay.  So you couldn't see the distance he

12   was from the car?

13        A.    From where I was at?

14        Q.    Yes.

15        A.    No.

16        Q.    But you could see him?

17        A.    Yes.

18        Q.    And you could see that he was in aim?

19        A.    Yes.

20        Q.    Okay.  Was he within the length of the -- of

21   the suspect vehicle or was he behind the suspect vehicle?

22        A.    He was in length of the suspect vehicle.

23        Q.    Okay.  So he was at least within the

24   proximity of the back end of the vehicle --

25        A.    Correct.

1          Q.        -- to the driver?

2          A.        Correct.

3          Q.        And that was -- assumed you saw him after the

4     gunshots?

5          A.        Correct.

6          Q.        Did you ever actual see Officer Smith fire

7     his gun?

8          A.        No, I did not.

9          Q.        Did you ever see anybody else with a gun?

10         A.        Except for the driver that was laying slumped

11    -- or laying to his right, he had a firearm.

12         Q.        Did you ever see him fire a gun?

13         A.        No, I did not.

14         Q.        Did you ever see the gun in his hand?

15         A.        No.

16         Q.        Was the other suspect ever obtained or

17    apprehended?

18         A.        Apprehended?

19         Q.        Yes.

20         A.        I believe so.

21         Q.        Did he have a gun on him?

22         A.        At the time I do not believe so.

23         Q.        Okay.  You said you -- when you walked up to

24    the suspect vehicle after the shots were fired, you observed

25    that the driver was hit, correct?

46

| | | |
|---|---|---|
| 1 | A. | Correct. |
| 2 | Q. | Did you see how many wounds he had? |
| 3 | A. | No, I did not. |
| 4 | Q. | Okay.  Did you see where they were? |
| 5 | A. | No, I did not. |
| 6 | Q. | So how did you know he was hit? |
| 7 | A. | Because there was blood all over him. |
| 8 | Q. | Okay.  Was the driver's side window -- |

driver's side door window shattered or --

        A.      I don't recall.

        Q.      Okay.  Did you review anything to prepare for

today's deposition?

        A.      Did I review anything?

        Q.      Yes.

        A.      No.

        Q.      And I know I asked if you spoke to Officer

Smith or officer Asbury about this incident since it and you

said no, but have you spoke to anyone else?

        A.      Yes, my attorneys.

        Q.      And no one other than your attorneys?

        A.      Huh-uh.

                MS. HUFF:  That's it.

                MR. HARDIN:  Let us just have a minute and

        we'll --

                MS. HUFF:  That's fine.

47

1          MR. HARDIN:  Well, we had 35 questions we

2     were going to ask, but we're going to ask none.

3          (Deposition concluded at 1:53 p.m. and

4               signature NOT waived.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

48

1

2                    COURT REPORTER'S CERTIFICATE

3          I, Jennifer Olivier, a Freelance Court Reporter and

4     Notary Public in and for the State of Ohio certify:

5          That the foregoing deposition of RYAN OLTHAUS, is a

6     true and accurate transcript of the deposition taken before

7     me at the time and place therein set forth at which time the

8     witness was put under oath;

9          That the testimony of the witness and all objections

10    made at the time of the deposition were recorded

11    stenographically by me and thereafter transcribed.

12    I further certify that I am neither counsel for nor related

13    to any party to said action, nor in any way interested in

14    the outcome thereof.

15         IN WITNESS WHEREOF, I have hereunto set my hand at

16    Cincinnati, Ohio on this 2nd day of May, 2013.

17

18

19                                   _____
                                     Jennifer Olivier
                                     Certified Court Reporter
20                                   and Notary Public in and
                                     for the State of Ohio
21

22                         My Commission Expires:   6/26/15

23

24

25